**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **SCOTT VINCENT VAN DYKE** | § | **Case No. 21-60052** |
| | § | |
| Debtor. | § | **Chapter 11 Case** |
| | § | |

---

**OBJECTION OF EVA ENGELHART, AS CHAPTER 7 TRUSTEE OF THE
ESTATE OF ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC.,
LITTLEMILL LIMITED, PROSPERITY SETTLEMENT FUNDING, INC.,
ANDREA LORE, INDIVIDUALLY AND IN HER CAPACITIES AS CO-
EXECUTOR OF THE ESTATE OF ROBERT M. PRESS, DECEASED AND
AS CO-TRUSTEE OF THE LORRAINE PRESS SUPPLEMENTAL CARE
TRUST AND ANZAR SETTLEMENT FUNDING CORP.
TO PLAN OF REORGANIZATION**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Eva Engelhart ("Engelhart"), as Chapter 7 Trustee of the Estate of Anglo-Dutch Petroleum International, Inc. ("ADPI"), on the one hand, and Littlemill Limited, Prosperity Settlement Funding, Inc., Andrea Lore, Individually and In Her Capacities As Co-Executor of the Estate of Robert M. Press, Deceased and As Co-Trustee of the Lorraine Press Supplemental Care Trust and Anzar Settlement Funding Corp. ("Investors," and together with Engelhart, the "Objectors"), on the other hand, file this Objection to Plan of Reorganization (the "Objection").  In support of the Objection, Objectors show as follows:

**I.
PRELIMINARY STATEMENT**

1.      The Objectors respectfully urge the Court to deny confirmation of Debtor Scott Van Dyke's ("Van Dyke") Plan of Reorganization. Stated very simply, the Plan requires Van Dyke's new and penniless entity Texas Petroleum Operations, L.L.C. ("TPO") to, among other things, (1)

attract sufficient investors, (2) secure the rights to drill four oil and gas wells on property located somewhere between Houston and Victoria, (3) drill four successful wells, and (4) generate sufficient profits enabling TPO to pay Van Dyke a salary large enough to pay (i) his mortgage, property taxes and other expenses on his home valued in excess of $5 million (the same home that Judge Gilmore found Van Dyke purchased using $3.8 million that he fraudulently transferred from ADPI to himself), (ii) his living expenses, and (iii) his creditors much less than pennies on the dollar.

2.     Objectors have retained economic expert Jeff Compton ("Mr. Compton") to analyze the economic feasibility of Van Dyke's plan. Mr. Compton is well-aware of Van Dyke's business practices. He was retained to perform insolvency and other analyses in connection with Engelhart's fraudulent transfer claims pending before Judge Gilmore. Notably, Judge Gilmore relied upon Mr. Compton's analysis—even mentioning him by name—when she granted summary judgment in Engelhart's favor as to the fraudulent transfer claims. After a lengthy and detailed analysis, Mr. Compton has concluded that the Plan is not feasible.

3.     The undersigned has attempted to retain an oil and gas expert to perform a technical evaluation of the Adams Prospect's feasibility. The undersigned represents that such expert could not perform such an analysis without knowing the precise location of the Adams Prospect and other information that Van Dyke refuses to disclose or produce. Van Dyke admits that potential investors would need to know the location of the prospect and require the opportunity to review the relevant documentation that Van Dyke refuses to produce. Van Dyke cannot possibly meet his burden to prove technical feasibility without disclosing or providing such information.

4.     Based upon the evidence presented, Van Dyke's plan would not be economically or technically feasible even if Van Dyke was trustworthy and had a stellar business record in the

oil and gas industry. Van Dyke has neither. As detailed below, four judges have found that Van Dyke has engaged in fraudulent behavior in connection with investors in his oil and gas ventures, and all of his oil and gas ventures have been abysmal failures. Van Dyke's fraudulent actions, business failures and bankruptcies and long history of unsuccessful litigation are matters of public record easily discoverable by potential investors doing their due diligence on Van Dyke before investing in his companies. The assertion that investors are going to invest in TPO or in any other Van Dyke company given his track record as just described is pure fantasy.

## II.
## FACTUAL BACKGROUND

5.     On May 25, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing this chapter 11 case with the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Bankruptcy Court"). Said bankruptcy filing occurred about a month after Debtor placed his company Anglo-Dutch Energy, L.L.C. ("ADE") into bankruptcy in Case No. 21-60036 (also pending in this Court).

6.     On October 29, 2021, the Debtor filed his Plan of Reorganization.

7.     On November 8, 2021, the Court converted the ADE bankruptcy case to a case under chapter 7 of the Bankruptcy Code.

8.     On December 11, 2021, the Debtor filed his Amended Plan of Reorganization (the "Plan").

9.     A hearing on confirmation of the Debtor's Plan is scheduled for December 15, 2021 at 1:00 p.m. CT.

## III.
## ARGUMENT AND AUTHORITIES

10.     The Plan proposed by the Debtor is not confirmable because it is not feasible and was proposed in bad faith. The Objectors urge the Court to deny confirmation of the Debtor's Plan.

### A.     The Plan is Not Feasible.

11.     11 U.S.C. § 1129(a)(11) requires the Debtor to prove that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." In other words, the Debtor must prove that the Plan is feasible by a preponderance of the evidence. *See In re T-H New Orleans L.P.*, 116 F.3d 790, 801 (5th Cir. 1997).

12.     "The feasibility test contemplates the probability of actual performance of the provisions of the plan, and whether the things to be done under the plan can be done as a practical matter under the facts." *In re M & S Assocs., Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992) (citing *In re Clarkston*, 767 F.2d 417, 420 (8th Cir.). Among the factors that courts consider when determining the feasibility of the Plan are: (1) the adequacy of the debtor's capital structure; (2) the earning power of the debtor's business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *Id.* Applying these factors to the Plan and to the evidence attached to or discussed herein, the Plan is not feasible and should not be confirmed.

### 1.     Economic expert Jeff Compton has prepared a detailed economic analysis of the Plan and concludes that the Plan is infeasible.

13.     The first three factors considered when assessing Plan feasibility (the adequacy of the debtor's capital structure, the earning power of the debtor's business and economic conditions)

essentially assess the economics of the Plan. Mr. Compton has assessed the economics of the Plan and evaluated its feasibility. Ex. 1. Notably, Judge Gilmore has vouched for Mr. Compton's credibility and competence. She relied upon Mr. Compton's insolvency analysis when she granted summary judgment in Engelhart's favor on her fraudulent transfer claims asserted against Van Dyke. Ex. 2, p. 10 ("Here, the Trustee's expert, Jeff Compton, concluded that ADPI was insolvent as of December 31, 2005, the day before the first transfer.").

14.     After a detailed analysis, Mr. Compton has concluded that the Plan is not feasible.

Ex. 1, p. 2. Mr. Compton's opinions include the following:

> Explanation of the Plan can be found in this report. The Plan set forth by Mr. Van Dyke lacks feasibility for the following reasons, detailed in this report:
>
> i. it unreasonably relies entirely upon all of multiple favorable events occurring with no capital or current operations to provide a buffer from the likely failure of one of the planned wells, given Mr. Van Dyke's claim of 70% historical success rate;
>
> ii. additional reorganization of the debts created by the shortfalls recognized in the Plan will be needed post-confirmation;
>
> iii. there is no capital provided by the debtor to cover shortfalls in cashflows which are evident from the debtor's projections;
>
> iv. the sources of debt or equity to purchase the required leases are merely speculative as is the hoped-for success selling those leases and drilling commercially productive wells. Nevertheless, the business and personal expenses of the debtor continue, creating debts without a reasonable basis for payment;
>
> v. the debtor has no current operations or recent business success;
>
> vi. from the standpoint of the unsecured creditors, the Plan primarily, as to dollars, provides the mechanism for Mr. Van Dyke to pay his significant personal living expenses, including the housing expenses arising from his $5 million homestead.

*Id.* (internal footnotes omitted).

15.     In addition to Mr. Compton's report, this evidence shows the economic situation for Van Dyke and TPO is even worse:

- Van Dyke's personal friends collectively loaned TPO $500,000. Ex. 3, pp. 43:15-44:4. As opposed to using those funds to pay TPO's employees or otherwise further TPO's business, Van Dyke distributed most of those funds to himself to pay his living expenses. *Id*. at pp. 179:13-20, 247:1-19, 248:7-15; Ex. 4. Van Dyke transferred almost all of the remainder of those loaned funds to ADE to pay ADE's expenses. Ex. 3, pp. 248:16-22; Ex. 4. Because Van Dyke did not use these loaned funds to pay TPO's employees or operational expenses, TPO's financial "hole" is $500,000 deeper than it should have been because the Plan contemplates that TPO will repay these loans. Dkt. No. 86, p. 22;

- Van Dyke's mother Mary Theresa Van Dyke passed away on December 7, 2021. Dkt. No. 86, p. 22. Historically, Van Dyke would obtain loans from his mother to keep his oil and gas ventures afloat. Ex. 3, pp. 29:10-19, 247:1-4, 249:15-19; Ex. 4. Van Dyke will not be able to rely on his mother (or his mother's assets) to loan money to TPO. Furthermore, based upon Van Dyke's testimony, it appears that his mother's estate has been depleted in any event. Ex. 3, p. 33:6-22;

- The Plan proposes that an "unknown" amount of the $907,233.26 of "[f]unds held in State Court Registry (61st Judicial District of Harris County) owed to ADE" will be made available to creditors. Dkt. No. 86, pp. 10-11. The right to those monies is the subject of a lawsuit pending in Texas state court. The Texas court that will decide to whom those funds are disbursed already has ruled that "Anglo-Dutch Energy, LLC and Scott Van Dyke do not own any rights, title or interests in or to any funds deposited into this Court's registry as a matter of fact and law." Ex. 5. Even if any of those funds somehow were disbursed to ADE, they would belong to ADE's bankruptcy estate. Because Van Dyke and his bankruptcy estate have not filed a proof of claim in the ADE bankruptcy, they would have no right to any such funds even in that case. Ex. 6. Thus, none of this $907,233.26 is available for Van Dyke's bankruptcy estate to disburse to creditors;

- The Plan similarly proposes that "[f]unds held in State Court Registry (61st Judicial District of Harris County) owed to Scott Van Dyke" in the amount of $422,750.85 will be made available to creditors. Dkt. No. 86, p. 11. The right to those monies is the subject of a lawsuit pending in Texas state court. The Texas court that will decide to whom those funds are disbursed already has ruled that "Anglo-Dutch Energy, LLC and Scott Van Dyke do not own any rights, title or interests in or to any funds deposited into this Court's registry as a matter of fact and law." Ex. 5. Thus, none of this $422,750.85 is available for Van Dyke's bankruptcy estate to disburse to creditors;

- The Plan also assumes that Van Dyke is entitled to repayment of a loan to ADE in the amount of $244,188.25 that then may be made available to his creditors. Dkt. No. 86, p. 11. Any funds repaid would belong to Van Dyke's bankruptcy estate. Because Van Dyke and his estate have not filed a proof of claim in the ADE bankruptcy, they have no right to any such funds. Ex. 6. Thus, this $422,750.85 is unavailable for Van Dyke's bankruptcy estate to disburse to creditors; and

- With the above subtractions, Van Dyke effectively has no assets currently that would be available to creditors.

16.     These first three factors of the feasibility test alone establish that the Plan is not feasible and should be rejected.

### 2.     The Plan is infeasible because Van Dyke lacks the managerial skills and abilities to get TPO up and running and make it profitable.

17.     Van Dyke's history of fraudulent actions, oil and gas business venture failures, penchant for taking investor money and using it for personal expenses, many breaches of contracts and lengthy unsuccessful litigation history show his lack of managerial skills and abilities and require rejection of the Plan. The fraudulent actions, business failures and bankruptcies and long history of unsuccessful litigation are matters of public record easily discoverable by potential investors doing their due diligence on Van Dyke before investing in his companies. The assertion that investors are going to invest in any Van Dyke company given his track record as just described is pure fantasy and delusional.

### a.     Judge Gilmore and three Texas state court judges have found that Van Dyke acted fraudulently when dealing with investors and others.

18.     The findings by four judges that Van Dyke acted fraudulently when dealing with investors and others support Plan rejection because those findings establish Van Dyke's lack of managerial ability and disastrous performance in the oil and gas industry and thus render the Plan infeasible. First, following a bench trial, the Honorable Lamar McCorkle concluded that "[b]y clear and convincing evidence, Anglo-Dutch and Van Dyke committed fraud against Smith." Ex. 7. Smith was one of the ADPI investors. *Id.*

19.     Second, in 2007, three transfers from ADPI to ADE or Van Dyke were scrutinized by a Texas state court in connection with ADPI's efforts to appeal an adverse judgment without

posting a supersedeas bond. Following an evidentiary hearing with live testimony, the Texas state court (the Honorable John Donovan presiding) made these (and other) findings:

- The evidence during the hearing established, among other things, that the Judgment Debtor had three significant transfers.

  a. First, ADPI loaned $14,324,546.23 to Anglo-Dutch Energy ("ADE"). At Mr. Van Dyke's direction, this loan was forgiven by ADPI on January 2, 2006. This loan is no longer booked by ADPI as an asset.

  b. Second, in January 2006, ADPI loaned ADE $1,415,000. At Mr. Van Dyke's direction this loan was forgiven by ADPI on February 16, 2006. The loan is no longer booked by ADPI as an asset.

  c. Third, in February 2005, ADPI loaned Mr. Van Dyke $3,800,000 to purchase his house. This loan was forgiven by ADPI in exchange for Mr. Van Dyke advancing $400,000 to ADPI. This loan is no longer booked by ADPI as an asset.

  \*        \*        \*

- The transfers made from ADPI to ADE were fraudulent transfers.

  a. The transfer of $14,324,546.23 from ADPI to ADE which was booked as a loan on the books of ADPI and then subsequently forgiven by ADPI on January 2, 2006, at the direction of Mr. Van Dyke, was made with the actual intent to hinder, delay, or defraud Mr. Swonke who is a creditor of the debtor.

  b. The transfer of $1,415,000 from January 6, 2006 to January 24, 2006, by ADPI to ADE, at Mr. Van Dyke's direction, was a transfer made with the actual intent to hinder, delay, or defraud Mr. Swonke who is a creditor of the debtor.

  c. The transfer by ADPI to Mr. Van Dyke of $3,800,000 on February 11, 2005 to purchase his house which was subsequently forgiven by ADPI on September 28, 2006, in exchange for Mr. Van Dyke advancing $400,000 to ADPI, is a transfer made with the actual intent to hinder, delay, or defraud Mr. Swonke who is a creditor of the debtor.

Ex. 8.

20.     During that hearing, Judge Donovan contemplated entering an injunction against ADPI but recognized the futility of doing so because "they've already completely drained [ADPI] of every possible penny they have." Ex. 9, p. 154:9-13.

21.     Third, three Investors tried their breach of contract/fraudulent inducement claims against ADPI and ADT to the bench before the Honorable R.K. Sandill. Judge Sandill concluded:

- ADPI and ADT fraudulently induced Mr. Press, Prosperity and Anzar to each sign a Settlement & Release of Claims Investment Agreement . . . because (a) they made material misrepresentations to each of them, (b) they made such misrepresentations with knowledge of their falsity or made them recklessly without any knowledge of their truth and as a positive assertion, (c) they made such misrepresentations with the intent that they be acted upon by each Plaintiff . . . .

- ADPI and ADT also fraudulently induced Mr. Press, Prosperity and Anzar to each sign a Settlement & Release of Claims Investment Agreement . . . because (a) they failed to disclose material facts within the knowledge of ADPI and ADT to each Plaintiff, (b) they knew that each Plaintiff was ignorant of the undisclosed facts and did not have an equal opportunity to discover the truth, (c) they intended to induce each Plaintiff to take some action by failing to disclose material facts . . . .

Ex. 10, CL 5, 6.

22.     Judge Sandill later explained his conclusions, stating "Van Dyke found a way that he could make some money and screw his investors and that's what he did . . . this is a big fraud." Ex. 11.

23.     Finally, and most recently, the Honorable Venessa Gilmore granted summary judgment finding as a matter of law that Van Dyke fraudulently transferred almost $20 million from ADPI to ADE and himself. Ex. 2. Judge Gilmore also entered a final judgment against Van Dyke and two of his companies in excess of $32 million. Ex. 12.

        **b.      All of Van Dyke's oil and gas businesses have failed miserably and have either stopped doing business or filed for bankruptcy.**

24.     Van Dyke's ineptitude and incompetence in running his oil and gas businesses further supports Plan rejection because all of his oil and gas businesses have failed miserably and

have either stopped doing business or filed for bankruptcy. Setting aside the new entities formed in the last eighteen months, every entity through which Van Dyke has done business in the oil and gas industry has either stopped doing business or filed for bankruptcy. Ex. 3, pp. 123:2-127:14.

25.     In the early 2000's, ADPI was in litigation against Halliburton and Ramco. Ex. 10, FF 6. During that time, ADPI was not making any money and needed funding to keep its doors open. *Id*. at FF 7, 8. Because banks and other traditional lenders would not lend ADPI money, ADPI obtained financing for its operations by entering into Claims Investment Agreements with thirty-three investors (the "Investors"). *Id*. at FF 9, 10. Stated very simply, Van Dyke promised and agreed to pay hefty investment returns to the Investors out of proceeds he hoped to recover in the Halliburton litigation. *Id*. at FF 21, 33, 44.

26.     In 2004, ADPI settled its lawsuit with Halliburton (but not with Ramco) for $51 million. Ex. 13. Despite that cash infusion, ADPI was insolvent by the end of 2005. Ex. 2, p. 10.

27.     Van Dyke's litigation with Ramco was tried and appealed. The Fourteenth Court of Appeals offered this assessment of what the oil and gas industry thought of Van Dyke:

> In light of this history marked by conflict and discord between Sugarland (the administrative member of Tenge Development) and Van Dyke, and given that some of the compensation in any deal would come from future payments conditioned on the profitability of the Joint Enterprise and Kazakhtenge, it is not surprising that there is evidence in the record that Sugarland took a dim view of Van Dyke. Hein testified that a contingent payout from Van Dyke was highly speculative because Van Dyke already had spent $16 million and "gotten nowhere," and he had "absolutely no confidence that [Van Dyke] could spend more money and get anywhere." In fact, Tenge Development rejected a March 8, 2000 offer from a company controlled by Van Dyke, even though the offer's terms were substantially similar to those of Central Asia's successful offer. Hein explained that this offer was rejected because of a lack of confidence and trust in Van Dyke and a conclusion that an arm's length transaction with a reputable party like Central Asia was a better alternative.

Ex. 14.

28.     Van Dyke testified he faced the prospect of putting ADPI into bankruptcy in 2006:

Q.     Now, have you ever contemplated taking ADPI or ADT into bankruptcy?
A.     Uh, yes.
Q.     All right.  When did you first contemplate doing that?
A.     I think it was -- I don't remember if it was in '06 or '07.
Q.     Okay.  And what were the circumstances under which you were contemplating taking ADPI into bankruptcy?
A.     Just that ADPI no longer had any funds available to itself, and so there was a question of whether to continue the company or not.
Q.     So you had this thought process about taking ADPI into bankruptcy in connection with the transfer of its assets to ADE. Is that correct?
A.     No.  No.  I'm not saying that.  I'm just saying that I believe it was in 2006 or 7 that I contemplated bankruptcy for ADPI and ADT.
Q.     At the time that you contemplated bankruptcy for ADPI, did you already know you were going to be transferring ADPI's assets to ADE, so therefore, ADPI wouldn't have much --
A.     No.
Q.     -- if anything left?
A.     No, I don't know about that.  I just know that that's the time window, I believe, that I was contemplating bankruptcy for the company.

Ex. 15, pp. 73:5-74:7.

29.     Van Dyke also could not pay relatively small investor judgments in 2009:

Q.     And is it your position, Mr. Van Dyke, that ADPI and ADT do not have the assets to pay the amount still due to Hunter Smith and Littlemill Limited?
A.     I don't believe they have the financial ability to do so at this time, no.
Q.     And they haven't had the financial ability to do so since at least 2007. Correct?
A.     Probably 2007. It may have been in 2006.

*Id*. at pp. 71:21-72:3.

30.     Van Dyke also could not pay investor judgments in 2012:

Q.     And ADPI and ADT today essentially have no money, correct? They've been dormant for a number of years, right?
A.      Yes, that's correct.

Ex. 16.

11

31.     More recently, the situations got so dire that both ADPI and ADE are in Chapter 7 and cannot be saved—both will be liquidated as part of the bankruptcy process. Ex. 3, pp. 122:10-11, 196:11-12.

        **c.**     **Van Dyke has a long history of taking investor or company money and using it for his home, personal expenses and other companies' expenses.**

32.     The Plan contemplates Van Dyke's successful solicitation of investors. There is no evidence that investors will invest any money in TPO given Van Dyke's long history of taking investor or company money and using it for his home and other personal expenses. For example, in 2007, Judge Donovan found that "Mr. Van Dyke can—and does—reach into ADPI any time to pay personal expenses for his household account any time he wishes." Ex. 8.

33.     Just six days before the hearing on Plan confirmation, Van Dyke admitted he distributed $500,000 loaned to TPO by personal friends to himself and to ADE to pay its expenses. Ex. 3, pp. 43:15-44:4; 179:13-20, 247:1-19, 248:7-22; Ex. 4. Because Van Dyke did not use these loaned funds to pay TPO's employees or operational expenses, TPO's financial "hole" is $500,000 deeper than it should have been because the Plan contemplates that TPO will repay these loans. Dkt. No. 86, p. 22.

34.     The idea that investors are going to invest money in TPO with Van Dyke's history of using invested funds for his own personal expenses is sheer and utter fantasy and not based in any reality.

        **d.**     **Van Dyke has a long history of breaching contracts with investors and others and refusing to pay bills.**

35.     Van Dyke's long history of breaching contracts with investors and others and refusing to pay bills also favors Plan rejection. This history has led to numerous lawsuits brought against Van Dyke and his companies by investors, vendors, property owners and others. Exs. 2, 7,

8, 10, 12, 13, 17-26. Such lawsuits have resulted in many final judgments being entered against Van Dyke and his companies. *Id.* These lawsuits span almost twenty years and show that the long history of unsuccessful litigation has not deterred Van Dyke from continuing to breach contracts as part of his business practices.

36.     The evidence further shows that Van Dyke continues to refuse to pay bills. This recent email from a royalty owner to Van Dyke's employee Harry McMahon is just one example:

> Anglo-Dutch issued a 1099 for 2019 that is incorrect.
> It's probably due to the royalty check(s) being cut, but never issued/sent.
> Can you get your guy to take those check(s) off his desk place them in the mail for distribution?
> I don't think it's in your best interest to falsify reports to the IRS. They tend to take a dim view of fraudulent accounting practices.

Ex. 27.

37.     Additional recent emails show this same pattern and practice. Exs. 28-31.

     **e.      Van Dyke is a rich litigation bully who refuses to compromise claims without regard to the disastrous consequences of such a practice.**

38.     Van Dyke's managerial ability is further called into question by his inability to evaluate claims in litigation rationally and his refusal to compromise claims without regard to the disastrous economic consequences of such obstinance. Here is how Van Dyke has described his handling of the Investors' breach of contract claims:

> ADPI's assets were depleted by the Investors' protracted litigation, which was disproportionate to their claims. ADPI incurred legal fees of around $2,161,393.97 largely incurred in connection with the four Investors' claims. I could not and did not anticipate that claims for $323,749.50 by the four Investors could ever have resulted in legal fees of this magnitude and drag on for 15 years.

Ex. 32.

39.     Although the Investors dispute Van Dyke's calculation of the value of their breach of contract claims, Van Dyke admits he was willing to spend about seven times the amount of

those claims (pert his calculations) on legal fees as of about two years ago. Van Dyke also writes in the Plan that these legal fees are a large reason why he filed for bankruptcy. Dkt. No. 86, p. 8. Incurring attorneys' fees in an amount seven times greater than what Van Dyke calculated his maximum exposure regarding the Investors' contract claims shows poor managerial skills.

40.     Van Dyke also mismanaged Louisiana litigation involving or affecting Trepador—an entity in which Van Dyke's scheduled value was $46.5 million (Dkt. No. 27)—such that a $450,000 claim allegedly led to a foreclosure and stripped Trepador of all of its value. See Dkt. No. 86, pp. 9-10. Apparently, the suit was brought because Van Dyke refused to recognize that an after-payout working interest was in effect. Ex. 3, pp. 116:15-117:23. Van Dyke testified that the negative result occurred because he ran out of money and could no longer fund the breach of contract defense in that litigation. *Id*.

### 3.     **Van Dyke contemplates using the same management team for TPO that he used in his other failed oil and gas ventures.**

41.     The fifth factor considered in a feasibility analysis is the probability of the continuation of the same management. Van Dyke has testified that the same management team that has managed the failure of all of his oil and gas ventures will be the same team to manage TPO. Ex. 3, pp. 120:22-122:23, 127:24-128:5. Using the same management team for the TPO venture supports Plan rejection because this team has mismanaged Van Dyke's other oil and gas ventures into abject failures over the past twenty years. As opposed to bringing in competent new talent to help manage TPO, Van Dyke proposes relying upon the same team that has a twenty-year record of failure in the oil and gas industry. There is no evidence that this failed management team is going to figure out how to manage TPO so that it is successful.

**4.     Additional factors further show that Van Dyke cannot manage TPO and make it a successful venture.**

42.     Finally, the feasibility test also considers all other factors relevant to TPO's successful operation. These additional factors further show that Van Dyke cannot manage TPO and make it a successful venture and further support rejection of the Plan.

> **a.     Van Dyke's refusal to disclose the location of the Adams Prospect precludes any technical evaluation of the Adams Prospect.**

43.     Van Dyke refuses to disclose the Adams Prospect's location or produce all documentation he has regarding that prospect because he claims such disclosures may entice competitors to pursue that prospect. Ex. 3, pp. 47:16-48:2. This Court, the creditors and all others must therefore trust Van Dyke—an individual with a lengthy history of failed oil and gas ventures and one whom at least four judges have found has committed fraud in his business dealings with investors and others—and his analyses regarding the prospect. This Court needs more than Van Dyke's unverified word and untested analyses to find the Plan is feasible.

44.     The undersigned has attempted to retain an oil and gas expert to perform a technical evaluation of the Adams Prospect's feasibility. The undersigned represents that such expert could not perform such an analysis without knowing the precise location of the Adams Prospect and other information that Van Dyke refuses to disclose or produce. Van Dyke admits that potential investors would need to know the location of the prospect and require the opportunity to review the relevant documentation that Van Dyke refuses to produce here:

> Q. What type of information will be provided to these prospective investors?
> A. They will want to see all the geology, all the seismic. They'll want to see other wells in the area that have been drilled to those depths. They'll want to see the -- the results. They want to see the logs, production data, that -- that type of information.
> Q. Will they want to know where the land is?
> A. Oh, absolutely.
> Q. And they'll want to know what other wells are in the immediate vicinity?

A. Yes.

Q. They'll want to see production records from those wells in the immediate vicinity?

A. Yes.

Q. So they'll want a list of those well names?

A. Uh-huh.

Q. And have you already obtained that type of well data from the Railroad Commission?

A. Yes.

Q. Have you produced that to us?

A. No.

Q. What type of information have you obtained from the Railroad Commission that you've not provided to us with regard to the wells around the Adams Prospect?

A. We have information on the location of those wells, the depths, the formations that they were perforated in, production volumes, rates, time frames. It's basic information you can get from the Railroad Commission. We have -- in some cases, we have logs. Unfortunately, not everybody produces a full log, gives a full log to the Railroad Commission, but whatever the Railroad Commission has available, we try to get a full, complete copy of that information from the Railroad Commission on that given well.

Q. And you would expect your potential investors to want to see that?

A. Yes.

Q. Because they're going to want to evaluate it?

A. They will -- well, they will want to have access to it. Some will review it, some will not. Some will review it to a greater extent than others will, but they will want to have access to it, yes.

Q. Okay. And you would expect that an investor would want to have access to that information?

A. For someone -- yes. For putting up that money to drill that first well.

Q. Do you expect that they're going to want to know not only where the 22- to 2400 acres for the Adams Prospect are located, but that they're going to want to know the location on that 22- to 2400 acres that you're proposing to drill?

A. Yes.

Q. They're going to want specificity, won't they?

A. Yes.

*        *        *

Q. Within the data that you have available to you, you have core samples from nearby wells?

A. I don't have core samples, the actual cores, but we have reports -- I have reports on the formations, the -- you know, the -- in the area, yes.

Q. Okay. And you have logs from nearby wells?

A. Oh, yes.

Q. You have seismic line information?

A. Yes, sir.

Q. And you would expect to be providing all of that to potential investors?

16

A. Yes.
Q. But, for instance, the logs --
A. The -- I expect to make it available to them.
Q. But for your reasons of keeping the information confidential, you've not provided the well information on the nearby wells to us; correct?
A. Correct.

Ex. 3, pp. 71:18-73:25, 80:22-81:14.

45.     Van Dyke cannot possibly meet his burden to prove technical feasibility without disclosing or providing such information to the Court and to the Objectors. This Court should not confirm any Plan without considering and evaluating all technical information and documentation that Van Dyke admits potential investors would demand before investing in TPO.

> **b.      Van Dyke admits he will not voluntarily disclose his history of fraudulent activities and contract breaches to potential TPO investors.**

46.     The Plan is infeasible for the additional reason that Van Dyke admits he will continue his fraudulent ways if he can get away with it. Specifically, Van Dyke has admitted he will not disclose to his investors his history of bankruptcies, fraudulent activities and judgments against unless he is directed to do so by counsel:

Q. As you contact potential investors for the Adams Prospect, do you intend to provide them information on the bankruptcy of ADE?
A. I don't know about that. It depends on what my counsel advises me to do.
Q. Do you intend to provide them information on the bankruptcy of ADPI?
A. Once again, it's based on the advice of my counsel. I don't know.
Q. Do you intend to provide them copies of the judgments that have been entered against you finding that you were involved in fraudulent transfers?
A. Once again, I think all these questions you're asking along these lines, I will defer to the advice of my legal counsel.

Ex. 3, p. 162:8-22.

47.     Although the Debtor claims that his means for implementation of the Plan is derived from his anticipated income from future operations, the Debtor's history of failed financial performance and fraud speaks for itself, demonstrating the infeasibility of a Plan relying on future

operations. *See In re Malkus, Inc.*, 2004 Bankr. LEXIS 2120, *10-11 (Bankr. M.D. Fla. 2004) (finding that "[a] debtor's past performance is one of the most important measures of whether a debtor's plan will succeed"); *In re Agawam Creative Marketing Assocs., Inc.*, 63 B.R. 612, 620 (Bankr. D. Mass. 1986) ("the financial progress made by the Debtor between 1984 and 1985 cannot support the Debtor's projections, in view of the thirty-year payout contemplated").

48.      The evidence of Plan infeasibility in this case is much stronger than the evidence in the following cases in which plans were held infeasible:

- *In re Northbelt, LLC*, 630 B.R. 228 (Bankr. S.D. Tex. 2020) (court found plan not feasible because (1) Debtor speculatively offered it could obtain more favorable financing terms once it was out of bankruptcy; (2) Debtor offered no details regarding its ability or intention to refinance the loan, and no further support beyond its president's testimony regarding interest rates for similar loans; (3) subject loan matured within the life of the amended plan, and debtor failed to explain how the loan balance would be satisfied by that date; (4) Debtor intended to satisfy a class of claims using funds that were presently inaccessible; and (5) the earning power of the business weighed against feasibility.).

- *In re Investors Fla. Aggressive Growth Fund*, 168 B.R. 760 (Bankr. N.D. Fla. 1994) (stating that "[t]he purpose of the feasibility requirement under § 1129(a)(11) is 'to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation'") (quoting *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989).

- *In re Valley Park Group, Inc.*, 96 B.R. 16 (Bankr. N.D. N.Y. 1989) (denying confirmation, in part, due to the Debtor's inability to substantiate its optimistic sales projections).

- *In re Mahoney*, 80 B.R. 197 (Bankr. S.D. Cal. 1987) (denying confirmation on the grounds that the plan was *not feasible and violated the best interests test because the* primary method of funding for the plan by developing real estate was not feasible where, *inter alia*, no construction budget for project had been prepared, no market survey had been done and no lenders were approached to determine willingness to lend money).

- *In re Sound Radio, Inc.*, 93 B.R. 849 (Bankr. D. N.J. 1988) (regarding feasibility, "the court is required to predict, *based on the historical data provided by the parties*, whether the debtor will "be able to make all the payments under the plan and to comply with the plan… All income projections indicating financial progress

must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic.") (emphasis added).

- *In re Stapleton*, 55 B.R. 716 (S.D. Ga. 1985) (finding that the debtors' assumptions were unreasonable and the fulfillment of the Plan was unattainable).

49.    Further, where a debtor proposes a long term payout to its creditors, "stricter proof of feasibility is required." *In re Belco Vending, Inc.*, 67 B.R. 234, 237 (Bankr. D. Mass. 1986) (plan seeking seven-year payout not confirmed); *see also In re Rack Eng'g Co.*, 200 B.R. 302, 306 (Bankr. W.D. Pa. 1996).   Here, the Plan proposes a payout to Holders of Allowed General Unsecured Claims, including Objectors, in a period of 5 years. Mr. Compton states:

> Even putting aside the uncertainty in the projected revenues, the Plan projects *negative* net cash flows in certain months and even *cumulative negative* net cash flows during certain periods (*i.e.* outflows exceed inflows) for TPO. As shown below, the Plan anticipates negative cash balances during 2022 and the second half of 2025. The Plan does not address how TPO will fund the negative shortfalls and carry on during these periods. In other words, the structure and source of funding during these periods to allow TPO to stay afloat are unknown. No capital or other operations exist to fund these shortfalls.

Ex. 1, p. 9 (internal footnote omitted).

50.    The absence of "stricter proof" of feasibility further requires Plan rejection.

**B.    <u>The Plan is Not Proposed in Good Faith.</u>**

51.    The Plan is not proposed in good faith as required under the Bankruptcy Code.  The requirement "of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purpose." *In re Little Creek Dev. Co. v. Commonwealth Mortgage Corp.*, (*In re Little Creek Dev. Co.*), 779 F.2d 1068, 1072 (5th Cir. 1986).  "Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot <u>evaluation of the debtor's financial condition, motives, and the local financial realities</u>." *Id*. at 1072-73 (emphasis added); *see also In re Humble Place Joint Venture v. Fory*, 936 F.2d 814, 817 (5th Cir. 1991) (applying

the *Little Creek* factors).  "In proceedings to confirm a plan, the debtor has the burden of proving

good faith." *In re Stanley*, 224 F. App'x 343, *2 (5th Cir. 2007). Courts also consider these factors:

> (1) "the reasonableness of the proposed repayment plan," (2) "whether the plan
> shows an attempt to abuse the spirit of the bankruptcy code," (3) whether the debtor
> genuinely intends to effectuate the plan, (4) whether there is any evidence of
> misrepresentation, unfair manipulation, or other inequities, (5) whether the filing
> of the case was part of an underlying scheme of fraud with an intent not to pay, (6)
> whether the plan reflects the debtor's ability to pay, and (7) whether a creditor has
> objected to the plan.

*Id.*

52.     One factor considered when evaluating good faith is the reasonableness of the

proposed Plan. As discussed in Mr. Compton's report (Ex. 1) and as discussed above, the Plan is

unreasonable. Those analyses will not be repeated here. The unreasonableness of the Plan supports

finding that the Plan was not proposed in good faith and should be rejected.

53.     Another factor considered when evaluating good faith—and a factor courts

sometimes break down into its component parts—evaluates the debtor's financial condition,

motives, and the local financial realities. Van Dyke has testified that neither TPO nor himself

currently has any income. Ex. 3, pp. 12:8-13:17, 15:17-19, 237:25-238:3. As shown above, Van

Dyke also admits he has squandered $500,000 loaned to TPO from personal friends and additional

monies loaned to TPO by his mother to pay his own personal expenses and the expenses of

bankrupt entity ADE. Additionally, Van Dyke has no investors in TPO, has not acquired any

leases, has not secured any money committed to drilling and has not done any of the other things

needed to acquire and develop the Adams Prospect. Ex. 3, pp. 61:25-62:1, 71:1-13, 84:4-17. There

is no evidence that Van Dyke has the ability or intent to effectuate the Plan.

54.     There is, however, ample evidence that Van Dyke has filed for bankruptcy to

protect his $5 million home and ability to pay the mortgage and property taxes, maintain his

"millionaire" lifestyle and avoid satisfying the judgments against him and debts owed by him. Mr.

Compton's analysis shows the following:

- In addition to the unlikely prospects for success described above, assuming TPO is successful and able to pay the projected salary to Mr. Van Dyke, then Mr. Van Dyke must live within his budget for any *distributions* to unsecured creditors to occur.

- The salary from TPO to Mr. Van Dyke under the Plan primarily provides a mechanism for Mr. Van Dyke to pay for his significant personal *living* expenses, which includes the housing expenses arising from his $5 million homestead, and then creditors.

- The Harris County Appraisal District ("HCAD") has valued Mr. Van Dyke's homestead at 1515 South Boulevard at $5,203,566 as of 1/1/2021.24 According to HCAD, Mr. Van Dyke's residence contains 10,812 square feet of living area and sits on a 45,267 square feet lot with a pool.

- As shown below, over the five-year period, almost 60% or over $2 million of Mr. Van Dyke's anticipated salary is projected to *be* consumed by his ongoing housing expenses. This equates to an average of $35,517 per month (i.e. $2,131,031 / 60 months) to allow Mr. Van Dyke to continue living in his house. Assuming Mr. Van Dyke is able to live within his budget, unsecured creditors would receive $600,000 over the same five-year period, which averages to $10,000 per month (i.e. $600,000 / 60 months).

Ex. 1, p. 12 (internal footnotes omitted).

55.    Van Dyke freely admits that he intends for the Plan to effectuate all of the above:

Q. Okay. Now we can go over to page 22. Source of payments under 6.1. "Payments and distributions under the Plan will be funded from Mr. Van Dyke's disposable income by his salary from TPO." What do you mean by "disposable income"?
A. Means under the schedules which we've given to you and everybody else, after -- you know, there are certain living expenses I have to have, such as groceries and utilities and -- and the like, and then after those are paid, mortgage is paid -- mortgage is a -- is one of the items in the plan, but -- but – but all the debts I have after my, quote/unquote, living expenses, then that becomes disposable income to pay creditors under the plan, so that -- that -- that -- it's basically the expenses. Utilities, groceries. Medical insurance.

*          *          *

A. And that's -- that's what was available. So you have the monies that come down to Scott Van Dyke, then Scott Van Dyke is getting certain money, and then he then pays his mortgage, he's got to pay the light bill and groceries and living expenses

and maintenance, that sort of thing. And then what are funds that are available left
over to -- you know, after you pay the secured creditors, what's available? And what
was available were the – these monies that we put in -- in this section here, in Class
4.

Ex. 3, pp. 137:1-17, 205:3-13.

56.     The inequities in the Plan are stunning. The Plan should not be confirmed.

57.     Another factor considered when evaluating good faith is whether there is any
evidence of misrepresentation, unfair manipulation or other inequities. In addition to what is
contained in Mr. Compton's report and set forth herein, Van Dyke filed fraudulent and false
schedules. When Van Dyke filed his Schedules on June 30, 2021, he represented that the current
value of his interest in an entity known as Trepador Energy, LLC was $46,500,000. Dkt. No. 27.
Van Dyke did not disclose to the Court or to any Trustee that a Final Judgment had been rendered
in Louisiana litigation on March 30, 2021 that—according to Van Dyke—stripped Trepador
Energy, LLC of virtually all of its value. Van Dyke also represented the ADE bankruptcy estate in
that bankruptcy and failed to disclose this information in that case as well. It was not until two
days after Van Dyke's Rule 2004 Examination that he amended his original plan, disclosed
additional information and attached thereto pertinent documentation, including the Final
Judgment, from that Louisiana litigation. Dkt. No. 86. Such misrepresentations and manipulations
further support denying the confirmation of the Plan.

58.     Another factor considered when evaluating good faith is whether the Plan reflects
the  debtor's ability to pay. As shown in Mr. Compton's report, the Plan piles unreasonable
assumptions and speculation upon unreasonable assumptions and speculation and fails if things to
not go precisely as Mr. Van Dyke proposes or hopes. Ex. 1. Mr. Compton's analysis shows that
Mr. Van Dyke has no realistic ability to pay under the Plan. The absence of any credible evidence

that Van Dyke has the ability to pay under the Plan also supports finding that the Plan was not proposed in good faith.

59.     The final factor considered when evaluating good faith is whether a creditor has objected to the plan. By this filing, the Objectors have objected to the Plan. This factor supports the finding that the Plan was not proposed in good faith.

60.     As further support for a finding that the Plan was not proposed in good faith, the Court need only look to the eligibility requirements for a Debtor to file a Subchapter V bankruptcy proceeding.  Debtors seeking to qualify under Subchapter V must be pursuing business activities and have aggregate debts that do not exceed $7,500,000.  *See* 11 U.S.C. § 1182.  Engelhart's claim against the Debtor alone vastly exceeds $7,500,000.  *See* Claim No. 15-1 filed by Engelhart for $41,475,496.41 based on a fraudulent transfer judgment.  Despite awareness of the pendency of this action, the Debtor did not list Engelhart's claim in his Top 20 Creditors List and only scheduled the Investors' claim as an "unknown" claim amount and a "disputed" claim for a "potential judgement."  *See* Dkt. 27.  The Debtor's monthly operating reports also do not reflect that Van Dyke is currently pursuing business activities; for the months of June, July, and October, his only receipts were from his mother, Theresa Van Dyke, ranging from $2,000 to $31,500, and for the months of August and September he had de minimis receipts from cash, insurance, returned merchandise, and TPO reimbursements.  Although the Objectors did not object to the Debtor's eligibility as a Subchapter V debtor earlier in this case, the Court should take into consideration the Debtor's lack of eligibility when considering whether the Plan was proposed in good faith.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons set forth herein, Engelhart and Investors respectfully request the Court deny confirmation of the proposed Plan.

Dated: December 13, 2021.          Respectfully submitted,

HAGANS MONTGOMERY HAGANS

*/s/ William Fred Hagans*
William Fred Hagans
Texas State Bar No. 08685500
fhagans@hagans.law
Carl D. Kulhanek, Jr.
Texas State Bar No. 11761850
ckulhanek@hagans.law
3200 Travis, Fourth Floor
Houston, Texas  77006
Telephone: 713-222-2700
Facsimile: 713-547-4950

- and –

NORTON ROSE FULBRIGHT US LLP

William R. Greendyke (SBT 08390450)
Julie Goodrich Harrison (SBT 20492434)
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
william.greendyke@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com

ATTORNEYS FOR EVA S. ENGELHART,
CHAPTER 7 TRUSTEE, LITTLEMILL LIMITED,
PROSPERITY SETTLEMENT FUNDING INC.,
ANDREA LORE, INDIVIDUALLY AND IN HER
CAPACITIES AS CO-EXECUTOR OF THE
ESTATE OF ROBERT M. PRESS, DECEASED
AND AS CO-TRUSTEE OF THE LORRAINE
PRESS SUPPLEMENTAL CARE TRUST AND
ANZAR SETTLEMENT FUNDING CORP.

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 13, 2021, a true and correct copy of the foregoing Objection was served upon the counsel and parties of record electronically through the Bankruptcy Court's Electronic Case Filing System on those parties that have consented to such service.

*/s/ Julie Harrison*
Julie Harrison