**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **In Re:** | § | **Case No. 21-60052 (CML)** |
| | § | |
| | § | |
| **SCOTT VINCENT VAN DYKE** | § | **Chapter 7** |
| | § | |
| **Debtor(s)** | § | **RE: Docket Nos. 354, 355, & 372** |

**MARY KATHERINE ALONSO AND RUDOLPH M. CULP, AS DEPENDENT**
**ADMINISTRATOR OF THE ESTATE OF MARY THERESA VAN DYKE,**
**DECEASED'S MOTION REQUESTING CONFIRMATION OF ORDER**
**CONDITIONALLY MODIFYING THE AUTOMATIC STAY TO PERMIT CERTAIN**
**PROBATE PROCEEDINGS TO CONTINUE**

<div style="border:1px solid black">

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

</div>

**To the Honorable Christopher M. Lopez, United States Bankruptcy Judge:**

Mary Katherine Alonso ("Ms. Alonso") and Rudolph M. Culp, the Dependent Administrator of the Estate of Mary Theresa Connelly Van Dyke, Deceased (the "Administrator" and, together with Ms. Alonso, the "Movants"), jointly file this *Motion Requesting Of Order Conditionally Modifying The Automatic Stay To Permit Certain Probate Proceedings To Continue* (the "Motion") and respectfully represent:

## I.    SUMMARY OF RELIEF REQUESTED

1.      Movants return to this Court for the third time to seek enforcement of this Court's

1

past orders allowing the Probate Court to finally set for trial (and conduct a trial on) the matters made clear by this Court's prior orders.  This Court's prior orders continue to be substantially ignored by Scott Van Dyke ("Van Dyke" or "Debtor") as Van Dyke continues to make certain statements to the Probate Court suggesting that a ruling is pending by this Court that compels the Probate Court to cancel yet another trial date.

2.    As the Court may recall, more than 180 days after this Court converted Van Dyke's failed Chapter 11 to a Chapter 7 case, Mary Katherine Alonso (Alonso), on behalf of the Estate of Mary Theresa Connelly Van Dyke, deceased (the "Probate Estate" or the Mother's Estate") was involved in a contest to appoint the administrator and Van Dyke claimed, among other matters, that his bankruptcy case prevented the Estate from taking certain actions.   Alonso filed her first Motion seeking permission to continue the probate of their Mother's Estate, appoint an administrator, and conclude all matters required.  On notice to Van Dyke and his lawyer, this Court entered its first order (Order #1, a copy attached as **Exhibit A**) that allowed the Probate Court to administer the Mother's Estate, without exception, provided, however, Alonso or the Mother's Estate would report to the Chapter 7 Trustee and this Court the outcome of all Probate Estate property and distributions and the Chapter 7 trustee reserved her rights to claim that any assets of the Probate Estate were property of the Chapter 7 Estate.

3.    More than a year later Van Dyke, in a renewed effort to avoid pending discovery motions to compel in ongoing litigation in the Probate Court, notified the Probate Court of his Discharge Order and demanded that all litigation in the Probate Court come to a hault.  Thereafter, the Administrator returned to this Court with a Motion to Clarify that the Probate Court was not impacted by the Discharge Order and the Probate Court could proceed to determine the heirs' entitlements, offsets, distributions in kind or in cash, if any.  This Court entered its clarifying Order

(Order #2, further defined below and attached as **Exhibit B**) instructing the parties that Order #1 was not set aside or limited by the Discharge Order and all Probate Estate claims against Debtor could proceed in Probate Court. *See* Order #2.

4.       Remarkably, Van Dyke, unsatisfied with this Court's rulings, filed a new action in the District Court, Southern District of Texas (Houston Division) seeking injunctive relief against the Administrator and Alonso, asserting the same argument made before this Court regarding Order #2 and asking the District Court for essentially the same ultimate relief – to enjoin the administration and litigation in the Probate Court.  As Van Dyke should have expected, the District Court referred the Lawsuit to this Court for a status conference, leaving this Court to reconsider, if it so elects, Order #2, or as requested by the Administrator, to enforce Order #2 and deny all relief in the pending referred District Court case.   More problematic, most recently, after seeking the procedurally improper injunction in this proceeding, Debtor demanded yet another continuance in Probate Court of the January 13, 2025 trial setting.  To convince the Probate Court of the merits of the Debtor's demanded continuance, Van Dyke told the Probate Court that the outstanding, but anticipated, rulings from this Court *have been "promised"* and that the issue of whether Debtor;s Discharge Order prevents a trial in the Probate Court has *not been ruled on* despite prior orders permitting Movants to move forward in the Probate Court, both pre-and-post Discharge Order. Van Dyke claimed he was told that the delays were because this Court is busy with the Alex Jones proceeding. [*See*, infra Note 4, and ¶¶ 22-25 including the Probate Court hearing transcript]. Following these representations by Van Dyke, the Probate Court cancelled the trial setting and suggested the parties should return to the Bankruptcy Court for this future ruling.

5.       Movants file this Motion out of frustration, not simply from Van Dyke's conduct in ignoring this Court's Orders, but in making continued representations about this Bankruptcy

Court's controlling jurisdiction over whether the trial in the Probate Court can proceed, knowing that State District or Probate Judges are extremely sensitive in deferring to Bankruptcy Courts and process, such that any misrepresentation is taken seriously, evidenced by the fact that two (2) Orders of this Court were presented to the Probate Court that then set a trial date, only to be derailed by Van Dyke's suggestion of promises of this Court ruling and reconsideration of its prior two (2) Orders.

6.     Movants are aware of no such promises and believe that the Court's prior orders have already clarified this Court's rulings that no Section 524 injunction prevents a trial in Probate Court.  Yet, the Debtor has now led the Probate Court to believe *that such a ruling is required before the trial in Probate Court can proceed*.   And Debtor may obtain future delays that benefit both him and other defendants based on such claims.  Therefore, it is necessary to file this Motion to seek this Court's third Order to prevent additional delays in the Probate Court.

## II.  **BACKGROUND FACTS**

7.     As this Court is aware, on May 25, 2021, Debtor filed a voluntary chapter 11 petition.

8.     On December 6, 2021, Debtor's mother passed away, and her Probate Estate was opened in Harris County, Texas.

9.     On January 31, 2022, this Court entered its Order Converting Case to Chapter 7. Docket No. 129.

10.     On May 6, 2022, Movant Ms. Alonso, together with the Chapter 7 Trustee, filed their *Joint Motion for an Order Conditionally Modifying the Automatic Stay to Permit Certain Probate Proceedings to Continue*. Docket No. 168 (the "Stay Modification Motion"). The Court entered its *Order Conditionally Modifying The Automatic Stay To Permit Certain Probate*

*Proceedings To Continue* on June 7, 2022 ("Stay Modification Order" or "Order #1"), [1] which Ms. Alonso agreed to in an attempt to preserve claims the Probate Estate may have against Debtor's interest in or liability to the Probate Estate.  The Debtor did not respond or otherwise object to the Stay Modification Motion or the Stay Modification Order.

11.     On December 7, 2022, the Court entered an *Order of Discharge*, Docket No. 284 (the "Discharge Order").

12.     On July 27, 2023, Rudolph M. Culp was appointed as the Dependent Administrator of the Estate of Mary Theresa Connelly Van Dyke, Deceased. Thereafter, Administrator became the party with legal authority to prosecute claims on behalf of the Probate Estate as well as object to the dischargeability of debts due to the Probate Estate.

13.     Following Administrator's appointment, Debtor has asserted his Discharge Order as a complete and total bar in the Probate Estate and litigation related to the Probate Estate to avoid liability in or to the Probate Estate.

14.     On June 20, 2024, Debtor filed a *Motion for Contempt and Show Cause*, contending that Movants violated a post-discharge injunction. *See* Docket No. 354.

15.     On June 21, 2024, Movants filed a *Motion to Clarify*, seeking clarification that the Movants' interpretation of this Court's Lift Stay Order permits Movants to prosecute claims against Debtor in the Probate Court. *See* Docket No. 355.

16.     On July 16, 2024, this Court issued its *Order Clarifying the Order Conditionally Modifying the Automatic Stay to Permit Certain Probate Proceedings to Continue* ("Clarifying Order" or "Order #2"), expressly allowing all Probate Estate claims against Debtor to proceed in

---

[1] *See* Court's Stay Modification Order, attached as **Exhibit A**.

Probate Court. Docket No. 358.[2]  Movants contend that this Clarifying Order resolved all doubt regarding whether Movants can proceed with the claims asserted against Debtor in Probate Court.

17.     Despite this Court's Order #1 lifting of the stay to permit probate proceedings to continue, and Order #2 clarifying that Movants can now proceed in Probate Court (which is well after this Court's Discharge Order), Debtor then filed in Federal District Court a wholly separate lawsuit against Movants, Ms. Alonso's counsel, Sarah Patel Pacheco, and JACKSON WALKER LLP for purported violations of a post-discharge injunction seeking the same relief that he sought before this Court (the "Lawsuit"). The Lawsuit came **after** this Court confirmed in Order #2 (which was entered well after the Discharge Order) that Movants could proceed in Probate Court with all of their Probate Estate claims against Debtor. The Lawsuit has since been referred to this Court.[3]

18.     After this Court issued its Clarifying Order (Order #2), Debtor filed: (1) *Debtor's Motion to Alter or Amend Order Clarifying Order Conditionally Modifying the Automatic Stay to Permit Certain Probate Proceedings to Continue* ("Motion for Reconsideration"), and (2) *Emergency Motion for Preliminary Injunction*. *See* Docket Nos. 361, 372.  Movants believe that these Motions are moot due to this Court's express order permitting all Probate Estate claims against Debtor to proceed in the Probate Court. Thus, this Court has before it (1) the newly referred Lawsuit seeking to avoid the relief that was the subject of Order #1 and Order #2;   (2) *Debtor's Motion for Reconsideration* seeking to avoid the relief that was the subject of Order #1 and Order #2;  and (3) *Debtor's Emergency Motion for Preliminary Injunction* seeking to avoid the relief that was the subject of Order #1 and Order #2.

---

[2] *See* Court's Clarifying Order, attached as **Exhibit B**, which includes the following provision: "The [Stay Modification Order] allows all Probate Estate claims against the Debtor to proceed in probate court."
[3] *See* Lawsuit Docket No. 9.

### III.   VAN DYKES' REPRESENTATIONS TO THE PROBATE COURT LEADING TO THE MOST RECENT CANCELLATION OF THE TRIAL DATE

19.     Following Debtor's attempt to obtain a preliminary injunction in this Court,[4] Debtor filed his Emergency Motion for Continuance of the January 13, 2025, trial setting in the Probate Court.

20.     On December 19, 2024, the Probate Court held a hearing to determine whether a continuance was warranted.  At the hearing, Mr. Kenneth Krohn, counsel for Debtor, represented to the Probate Court that this Court has "***promised*** an order clarifying whether or not [Debtor] has been discharged."[5]  And, Mr. Krohn further suggested that the delay in this "promised" ruling was because "Judge Lopez is dealing with the Alex Jones' Infowars bankruptcy proceeding" and "does not feel that [this case] is as pressing."[6]

```
 4              MR. KROHN:  Well, that kind of gets into a

 5   secondary issue, Your Honor, which is Judge Lopez at the

 6   bankruptcy court has been promising an order clarifying

 7   whether or not Scott has been discharged or the claims

 8   survive since October 8th.

 9              What I understand -- I didn't speak with

10   Judge Lopez's staff, but having spent -- Matt Probus is

11   the bankruptcy lawyer.  The issue is Judge Lopez is

12   dealing with the Alex Jones' Infowars bankruptcy

13   proceeding.  I would say brouhaha, but there seems to be

14   the more appropriate legal term.
```

---

[4] Debtor's request for preliminary injunction seeking a ruling on or before January 6, 2025, is now moot.
[5] *See* Transcript from December 19, 2024, Hearing, at 40:4-8, attached as **Exhibit C** and incorporated herein by this reference.
[6] **Exhibit C**, at 40:4-14.

```
16                    MR. KROHN:  And so kind of does not -- does
17   not feel our case is as pressing as perhaps that one is.
18   So if we do have a trial setting in May -- we've been
19   waiting since October.  We could have a finding today or
20   we could have a finding in April.  And so I just don't
21   know.  And so I would just -- if we're going to have a
22   trial setting, that's fine.  But I just want the Court
23   to be aware that we may still be waiting for a ruling
24   from the bankruptcy court as to whether Scott is liable
25   or not.  And that's kind of a fundamental issue in the
```

21.     Movants are unaware that this Court has "promised" anything to anyone.   This Court has issued two orders based on submitted briefing.  Movants believe that the Stay Order's language, together with this Court's Clarifying Order, permit Movants to proceed in the Probate Court to determine what interest, if any, Debtor has remaining in the Probate Estate based on Debtor's interest in or liability to the Probate Estate.  *See* Docket No. 358, Clarifying Order ("The Stay Order allows **all Probate Estate claims against the Debtor** to proceed in probate court.") (emphasis added). Thereafter, any interest the Chapter 7 Trustee asserts in the Probate Estate is subject to further review by this Court. This is precisely what Movants have done in accordance with these Orders.

22.     What has become clear is Debtor wants delay.  Debtor continues to promote, and has now obtained, a continuance from the Probate Court in part purportedly to "secure rulings from the Bankruptcy Court" that are controlling in the Probate Court.  This is based on the foregoing representations to the Probate Court that the parties are still "waiting for a ruling" from this Court, and that there in fact is an "injunction" in place despite this Court permitting Movants

to move forward in the Probate Court on multiple occasions.[7]  Debtor's contentions are also based on his presumed speculation the Alex Jones proceeding is "more pressing" than the current proceeding and "promised rulings."

23.     Debtor also told the Probate Court that there was an injunction under 11 U.S.C. section 524 that is **currently in effect**, and that this Court must issue a ruling despite having previously held that Movants were permitted to pursue claims in the Probate Court.[8]

| | |
|---|---|
| 4 | THE COURT:  At this point, we're not under |
| 5 | a stay, correct? |
| 6 | MR. KROHN:  Well, not under the 365 stay. |
| 7 | Our position in bankruptcy court is the 524 injunction |
| 8 | prevents Mr. Culp, Mrs. Alonso, even her lawyers from |
| 9 | continuing or commencing an action on a claim that has |
| 10 | been discharged.  So there's not -- there's an |
| 11 | injunction, right, there is an injunction.  And what |
| 12 | Scott had to do in bankruptcy court is he had to file a |
| 13 | motion to show cause for contempt under that injunction. |
| 14 | That has been what has been pending since September or |
| 15 | October.  And I can tell you the exact date.  It's in |
| 16 | the motion. |

24.     Following these representations and other arguments the Probate Court granted a continuance of the trial to June 2, 2025.[9]  And the Probate Court suggested it would move the trial again if this Court does not issue the ruling that Debtor's counsel has suggested is forthcoming.[10]

---

[7] **Exhibit C**, at 40:16-25.
[8] **Exhibit C**, at 42:4-16.
[9] **Exhibit C**, at 45:12-16.
[10] **Exhibit C**, at 42:18-24.

25.     Debtor's delay tactics are further concerning given that Mr. Krohn also informed the Probate Court that, because the Probate Estate sought an accounting in Probate Court, Debtor would be required to retain criminal defense counsel to defend against allegations of breach of fiduciary duty.  If the Debtor had previously provided credible information to this Court and the Probate Court, it is unclear why he believes he needs to retain criminal defense counsel.[11]

## IV. RELIEF SOUGHT

26.     Debtor has used the pending Motions in this Court (Docket Nos. 361, 372) as a delay tactic in the Probate Court in an attempt to first avoid discovery and now trial in the Probate Court.  Debtor has utilized the parallel litigation to again avoid a January trial setting in Probate Court.   Accordingly, the Movants respectfully request that:

   a.  These three (3) pending matters (Docket Nos. 354, 361, and 372) be considered together and the Court enter an order denying all such relief and find that Debtor's request for a preliminary injunction is moot;

   b.  This Court enter yet a third order affirming the Courts' prior two (2) orders (Docket Nos. 176 and 358) and confirm that there is no injunction currently in effect

---

[11] See **Exhibit C**, at 26:12-20, which provides:

```
12              Mr. Culp went to great extent to come back
13   and talk about misappropriation of money by Mr. Van Dyke
14   that's unexplained.  I do not believe that the statute
15   authorizing a fiduciary account in any way would
16   circumvent my client's constitutional rights either to
17   assert a Fifth Amendment defense to responding and
18   incriminating himself in criminal conduct.  And if
19   that's the allegation here, he stole money, my client
20   certainly needs a criminal defense counsel.
```

preventing Movants from pursuing Probate Estate claims against Debtor in the Probate Court;

c.   This Court, pursuant to this Court's Clarifying Order [Docket No. 358] and the proposed order granting this Motion (the "Proposed Order #3"),  confirm that Movants are permitted to proceed to trial in the Probate Court on all Probate Estate claims against Debtor and find and confirm that Movants have not violated any post-discharge injunction;

d.   This Court enter its Order preventing Debtor from seeking any further delays in the Probate Court based on any claim of bankruptcy jurisdiction or the bankruptcy Discharge Order without first obtaining this Court's permission, and further Ordering that any further request of Debtor filed with this Court shall not in any manner impede the Probate Court from probating the Probate Estate, ordering discovery or other pre-trial matters, and conclude the pending litigation, and the filing by Debtor of such a request shall not be grounds for Debtor to request or demand any further continuance in the Probate Court, unless and until this Court actually orders such relief; and

e.   This Court enter Proposed Order #3 without prejudice to the Movants' right to seek sanctions with respect to any violation of the Proposed Order #3 following its entry, and to seek sanctions for all delaying conduct of Debtor from and after the entry of the Courts's Order #2.

11

## V. <u>CONCLUSION</u>

27.     Debtor has continued to use the bankruptcy proceeding as a sword under the guise of a shield by his erroneous interpretations of this Court's Order #1 and Order #2 to delay trial in the Probate Court.

28.     Movants seeks a confirmation ruling from this Court to finally put to rest Debtor's erroneous interpretations of this Court's Order #1 and Order #2 and allow the trial in Probate Court against Debtor and others to go forward, including the requests set out in ¶ 26 above.

29.     Movants Mary Katherine Alonso and Rudolph M. Culp, the Dependent Administrator of the Estate of Mary Theresa Connelly Van Dyke, Deceased, respectfully request that this Court grant all relief requested above, and grant such other and further relief to which Movants may show they are justly entitled, both at law and in equity.


Dated:  January 27, 2025

<div style="text-align:right">

*/s/ Bruce J. Ruzinsky*
_____
**JACKSON WALKER LLP**
Bruce J. Ruzinsky (TX Bar No. 17469425)
Genevieve M. Graham (TX Bar No. 24085340)
Emily Meraia (TX Bar No. 24129307)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:       (713) 752-4221
Email:           bruzinsky@jw.com
                 ggraham@jw.com
                 emeraia@jw.com


- and –

SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
***Jordan & Ortiz, P.C.***
500 North Shoreline Blvd., Suite 900

</div>

Corpus Christi, TX 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
Email: sjordan@jhwclaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2025, I caused a copy of the forgoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Bruce J. Ruzinsky*
Bruce J. Ruzinsky

**<u>EXHIBIT A</u>**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 07, 2022

Nathan Ochsner, Clerk

THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In Re: | § | Case No. 21-60052-CML |
| | § | |
| | § | |
| SCOTT VINCENT VAN DYKE | § | Chapter 7 |
| | § | |
| Debtor(s) | § | |

**ORDER CONDITIONALLY MODIFYING THE AUTOMATIC STAY TO PERMITCERTAIN PROBATE PROCEEDINGS TO CONTINUE**

Upon the Joint Motion of Catherine Curtis, Chapter 7 Trustee for the Estate of Scott VanDyke and Mary Katherine Alonso, a party in interest requesting an Order Conditionally Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362 to Permit Certain Probate Proceedings to Continue as set out hereinbelow, and finding that this Court has core jurisdiction over the relief sought and due and proper notice and opportunity to be heard has been afforded according to law, and the Court further finds:

1. On May 25, 2021 (the "Petition Date"), Scott VanDyke (herein the "Debtor") filed a voluntary Chapter 11 Petition [Dkt #1] that has since been converted to a Chapter 7 case [Dlt #129], (the "Bankruptcy Case") with Catherine Curtis being appointing and qualifying and is now acting as the Chapter 7 case Trustee (herein "Trustee").

2. The Court has jurisdiction over this Motion under 28 U.S.C. § 1334, which is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and venue of this proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. Beyond 180 days from the Petition Date, and on or about December 6, 2021 the Debtor's and Alonso's mother Mary Theresa Connelly VanDyke died and probate of her estate has been opened in Harris County, Texas, Docket No. 501470 (the "Estate").

4. The Debtor's sisters, including Mary Katherine Alonso, are heirs to the estate and Alonso has filed her First Amended Application For Probate of Will (the "Application"), a true and accurate copy of which is attached to the Joint Motion whereby Alonso seeks the appointment as the Independent Administrator of the Estate and seeks letters of administration confirming her power and authority.

5.      The Debtor has applied for appointment as the Independent Executor under and pursuant to a Durable Power of Attorney and Living Will set out in the Application.

6.      In response, as set out in the Application filed by Alonso, are a series of claims made by Alonso that the Debtor has breached his fiduciary duty to his mother, to the Estate, and to the family members and is unqualified to serve in a fiduciary capacity to the Estate.

7.      The probate court has jurisdiction over Estate property and the handling of the Estate's property, subject in part to the automatic stay arising upon the Debtors filing of his Bankruptcy Case and the Probate Court has exclusive jurisdiction to administer the Probate Estate but desires that the Trustee and Alonso obtain modification of the automatic stay to allow the determination of all issues related to probate and the right and entitlement of probate-related parties, to be determined by the Probate Court, and subject to the conditions of this Order.

8.      The Trustee and Alonso seeks to modify the automatic stay which may be applicable to all proceedings by the parties in the Probate Court and to allow each party to proceed in the Probate Court and to preserve all rights and claims to any interest of the Debtor in and to the Estate, Estate Property, or liability to the Estate, subject to the conditions of this Order.

and the Court accordingly further finds that good cause exists for the relief requested by both the

Trustee and Mary Katherine Alonso in all things, and accordingly, it is

ORDERED that the stay of all proceedings provided in 11 U.S.C. § 362 be, and is hereby

modified and partially lifted to allow the Trustee and Mary Katherine Alonso, as the case may be,

to proceed in the Probate Court to pursue their respective rights and obtain any and all remedies

and relief available in the Probate proceeding of the Estate including against: (i) the Debtor or the

Debtor's rights or interest in the Estate or the Estate's property; or (ii) the Debtor's liability to the

Estate or to Alonso or to the Trustee; to the extent that the Debtor is found to have any interest,

tangible or intangible, in any of the Estate's property as determined by the Probate Court; and it is

further

ORDERED that the disposition of any interest, if any, found to belong to the Debtor in, or

to, the Estate or in, or to, any Estate Property, and to the extent the Trustee asserts a claim thereto,

shall be fully preserved to a determination by the Bankruptcy Court as between the bankruptcy

estate and any adverse or competing claim of Alonso to such interests of the Debtor; and it is further

ORDERED that this determination of competing interest shall be promptly brought by Motion of the Trustee in, and determined exclusively by, this United States Bankruptcy Court; and it is further

ORDERED that the Court retains jurisdiction to modify, amend this Order on the Motion of a party in interest.

Signed: June 07, 2022

Christopher Lopez
United States Bankruptcy Judge

**EXHIBIT B**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 16, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| In Re: | § | Case No. 21-60052 (CML) |
| | § | |
| | § | |
| **SCOTT VINCENT VAN DYKE** | § | Chapter 7 |
| | § | |
| Debtor(s) | § | RE: Docket No. 355 |

## ORDER CLARIFYING THE ORDER
## CONDITIONALLY MODIFYING THE AUTOMATIC
## STAY TO PERMIT CERTAIN PROBATE PROCEEDINGS TO CONTINUE

The Movants filed their *Joint Motion to Clarify the Order at Docket No. 176 Conditionally Modifying the Automatic Stay to Permit Certain Probate Proceedings to Continue* (the "Motion"),[1] and finding that this Court has core jurisdiction over the relief sought and due and proper notice and opportunity to be heard has been afforded according to law, and the Court hereby ORDERS THAT:

1. The Stay Order allows all Probate Estate claims against the Debtor to proceed in probate court.

2. This Order shall be immediately effective and enforceable upon its entry.

3. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed:  July 16, 2024

_____

Christopher Lopez
United States Bankruptcy Judge

---

[1] Capitalized terms not defined in this Order are defined in the Motion.

# **EXHIBIT C**

1                    REPORTER'S RECORD

2              TRIAL COURT CAUSE NO. 501470

3    IN THE ESTATE OF          )  IN THE PROBATE COURT
                               )
4    MARY THERESA CONNELLY     )
     VAN DYKE,                 )  NUMBER TWO (2) OF
5                              )
     DECEASED                  )  HARRIS COUNTY, TEXAS
6

7              TRIAL COURT CAUSE NO. 501470-401

8    MARY KATHERINE ALONSO AND )  IN THE PROBATE COURT
     RUDOLPH M. CULP, AS DEP.  )
9    ADMINISTRATOR OF THE      )
     ESTATE OF MARY THERESA    )
10   CONNELLY VAN DYKE, DECEASED )
                               )
11   VS.                       )  NUMBER TWO (2) OF
                               )
12   SCOTT VAN DYKE, PAYTON    )
     BOOMER INVESTMENTS, LLC,  )
13   AND PATTEN TITLE          )
     HOLDINGS #1, ET. AL.      )  HARRIS COUNTY, TEXAS

14

15

16              *******************

17               **MOTIONS HEARING**

18              *******************

19

20        On the 19th day of December, 2024, the following

21   proceedings came on to be heard in the above-entitled

22   and numbered cause before the Honorable Pamela Medina,

23   Judge presiding, held in Houston, Harris County, Texas;

24        Proceedings reported by computer-aided

25   transcription/stenograph shorthand.

1                   **A P P E A R A N C E S**

2

3      MR. CULLEN MCDONALD
       JACKSON WALKER, LLP
       1401 McKinney, 19th Floor
4      Houston, Texas 77010-1079
       PHONE:  713.752.4200
5      **ATTORNEY FOR MARY KATHERINE ALONSO**

6           **- AND -**

7      MR. RUDOLPH M. CULP
       1401 Truxillo Street
8      Houston, Texas 77004
       PHONE:  713.659.4200
9      **DEPENDENT ADMINISTRATOR**

10          **- AND -**

11     MR. KENNETH KROHN
       2100 West Loop South, Suite 1125
12     Houston, Texas 77027
       PHONE:  713.429.0575
13     **ATTORNEY FOR SCOTT VINCENT VAN DYKE**

14          **- AND -**

15     MR. PETER SMART
       CRAIN CATON & JAMES, P.C.
16     1401 McKinney, Suite 1700
       Houston, Texas 77010
17     PHONE:  713.752.8602
       **ATTORNEY FOR PAYTON BOOMER INVESTMENTS, LLC**

18

19

20

21

22

23

24

25

1                      **I N D E X**
                    **(MOTIONS HEARING)**
2

**DECEMBER 19, 2024**

3                                                    **PAGE**

Motion to Compel Accounting................... 4

4  Court's ruling.............................. 34

5  Reporter's Certificate....................... 49

6            **ALPHABETICAL WITNESS INDEX**

7              (No witnesses this volume)

8                 **EXHIBIT INDEX**

9              (No exhibits this volume)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Open court, no jury)

2              THE COURT:  I call Cause No. 501470, in the

3  Estate of Mary Theresa Connelly Van Dyke.

4              All right.  If each of you could please

5  announce for the record.

6              MR. MCDONALD:  Cullen McDonald on behalf of

7  Mary Katherine Alonso.

8              MR. CULP:  Rudy Culp, dependent

9  administrator.

10              MR. KROHN:  Kenneth Krohn on behalf of

11  Scott Vincent Van Dyke, Your Honor.

12              MR. SMART:  Peter Smart on behalf of Payton

13  Boomer Investments.

14              THE COURT:  Okay.  So on a motion to compel

15  payment for purchase of personal property; is that

16  correct?  Motion to compel payment for the purchase of

17  personal property.

18              MR. CULP:  Is that set today?

19              THE COURT:  That's what I have on my docket

20  sheet.

21              MR. CULP:  Well, I'm happy to discuss it.

22  I don't have it with me, but I am happy to discuss it.

23  That's a -- would you like to go forward with that?

24              THE COURT:  Are you prepared?  There may be

25  an issue --

4

```
 1              MR. CULP:  I'm prepared -- I know what it
 2   is.  So I'm happy to do it as long as everyone else
 3   wants to hear it.
 4              MR. KROHN:  No.  I don't think I noticed
 5   that hearing, Your Honor.  If it was on the docket, I
 6   don't think I --
 7              THE COURT:  It was not yours?  Okay.
 8              MR. CULP:  It was mine.
 9              MR. SMART:  I think there's two or three
10   things on the docket, but I don't believe that's one of
11   them.
12              MR. KROHN:  So in the base matter, 501470,
13   there is a motion to compel an accounting, but the
14   notice of hearing was issued under the 401.  So you may
15   have picked up the motion to compel --
16              THE COURT:  I do have the motion to
17   compel -- provide accounting and for contempt and
18   sanctions.
19              MR. CULP:  Yes.
20              THE COURT:  That's yours.
21              MR. CULP:  Yes.
22              THE COURT:  I also have the other one.  I'm
23   not sure why.
24              MR. KROHN:  I think it got picked up
25   because the notice was filed in the wrong cause number.
```

1   And so it got -- the motion to compel that is pending in

2   the estate -- the motion to compel in the estate, the

3   base matter, is the one that I think Mr. Culp --

4                    MR. CULP:  Yes.

5                    MR. KROHN:  -- intended to notice today.

6   The notice that he filed, though, was in the 401.  And

7   so -- but the notice actually says -- if you look at the

8   notice of hearing, it's on the motion to compel

9   accounting.

10                    THE COURT:  Right.  And then I have also

11   have a motion for leave of court to take deposition of

12   Scott Van Dyke.  Is that --

13                    MR. MCDONALD:  That's our motion, Your

14   Honor.

15                    THE COURT:  Okay.  So just those two?

16                    MR. KROHN:  Well, we also filed a motion to

17   continue, Your Honor.

18                    THE COURT:  Oh.  When did you file that?

19                    MR. KROHN:  Monday.  And it got filed in

20   both cases.  And we requested it be set for a hearing

21   today.  We provided notice on Monday.

22                    THE COURT:  Okay.  Your motion -- I'm

23   sorry.  I didn't get the motion for continuance.  I'm

24   not sure why.

25                    MR. KROHN:  The motion itself, Your Honor,

1  is relatively short, but the attachments, just to kind

2  of give -- are long, but they're just informative to

3  understand the underlying -- underlying issue.

4            THE COURT:  Motion for continuance.

5  12-16-2024.  Maybe it's because of the time, maybe.

6            MR. KROHN:  Maybe, Your Honor.

7            THE COURT:  Not three days.  Yeah, they

8  didn't pull that one.

9            And were you provided notice on motion for

10  continuance?

11            MR. CULP:  Notice was filed.

12            THE COURT:  You did have notice.  Okay.

13  But it's not agreed to, correct?

14            MR. MCDONALD:  It's not agreed, Your Honor.

15            THE COURT:  Okay.  So the continuance is

16  just for the trial; is that correct?

17            MR. KROHN:  Correct, Your Honor.

18            THE COURT:  January 16th.

19            MR. KROHN:  Yes, Your Honor.

20            THE COURT:  Okay.  So why don't we just go

21  forward with the -- not the motion to compel payment,

22  but provide accounting.  Let's move forward on that one.

23  And I guess motion for leave of court to take

24  depositions.  Those two.  Let's do those.  And then

25  we'll move to the last.

1          MR. KROHN:  Thank you, Your Honor.

2          THE COURT:  You're welcome.

3          You may proceed.

4          MR. CULP:  Thank you, Your Honor.

5          Your Honor, as you know, I'm the dependent

6  administrator of this estate.  And this a -- kind of a

7  continuance from an order entered by this Court on

8  September 26th of 2024, ordering Mr. Van Dyke, Scott Van

9  Dyke, to account to me for the actions taken under the

10 power of attorney.  If -- do you have a copy of the

11 accounting?  I have a copy if I can approach.

12          THE COURT:  Okay.  Yes, you may.

13          MR. CULP:  This is attached as Exhibit E-1

14 to my second motion to compel.  And that is the

15 accounting that we received as response to your order

16 compelling Mr. Van Dyke to provide an accounting.

17          Where it's lacking significantly is No. 3

18 of the order which states "A complete account of all

19 receipts, disbursements, and other actions of the

20 attorney-in-fact or agent, including their source and

21 nature of each receipt, disbursement, or action, with

22 receipts of principal and income shown separately."

23          And so what you have there is a list of

24 what Scott indicates are assets he's aware of.  You will

25 see that he does indicate certain sums of money that he

1   was -- received by the -- himself as power of attorney.

2   But what you don't see is any description of what

3   happened with those funds.  And so that's where it gets

4   really interesting, Your Honor.

5                   I apologize.  May I approach?

6                   THE COURT:  Yes.

7                   MR. CULP:  And this is attached as G-1

8   through -- Exhibits G-1 through I-1 of my second motion

9   to compel.  And these are documents -- these are bank

10  statements from the decedent.  And you will see -- the

11  first one is included simply to show that Scott Van Dyke

12  is listed as power of attorney at least as early as

13  December of 2017.

14                  And if you turn a few pages in, you will

15  see that we start to see that the checks written on this

16  account are all written by Mr. Van Dyke.  These are

17  pretty innocuous, Amazing Place -- I don't know what

18  these are -- Ann Harris Bennett Tax Assessor.  That

19  could be for the decedent, it could be for Scott, but

20  these are written by Scott.

21                  But in his accounting, there is no

22  indication of what this is for.  They're not even

23  listed.  We have no -- no information.  He's going to

24  claim that he doesn't have access to these.  But, Your

25  Honor, under the code he is bound to maintain these

1  records until he is discharged by either the principal

2  or the Court.  Neither of which has ever happened.

3              And let's see.  So if you turn another

4  page, you will see the G-2, May 11th, 2021 statement.

5              THE COURT:  Uh-huh.

6              MR. CULP:  And that's where you have the

7  influx of -- from Payton Boomer of $30,000.  And that's

8  on page 2 of this statement.  And then $161,000 from

9  Patten Title.  And that was the transaction that is the

10 basis of the lawsuit in regards to the purchase of the

11 house.  And so those funds do go into the decedent's

12 account.

13             But what gets really interesting is when

14 you start to look at how those proceeds were spent

15 immediately after they were received.  So if you turn to

16 page 4 of 6 of that statement, you will see Scott Van

17 Dyke writes himself a check for $1400.  There's many

18 checks here.  As soon as the money comes in, he starts

19 spending it.

20             But then you look at 5 of 6, you will see

21 another check to Scott Van Dyke himself for 3,000,

22 another check to himself, Scott Van Dyke, for 1,000,

23 another check to Scott Van Dyke for 3,000, another

24 check -- oh, then there's a check to Texas Petroleum

25 Operations LLC.  That's under the -- and I have the

1   documents, but if you -- the Texas Secretary of State

2   shows Scott as the sole owner of that company.  And

3   that's $52,100 to them.  And then you have a withdrawal

4   signed by -- all of these are signed by Scott -- of

5   $25,000 from that account in cash.

6            So now we're down to 100,000 if you go to

7   G-3.  And if you turn to Page 5 of 8 of that statement,

8   you will see again Scott Van Dyke $3,000; Texas

9   Petroleum Operation, $27,000; Scott Van Dyke, $5,000;

10  another Scott Van Dyke, $5,000.  Next page.  Scott Van

11  Dyke, $4,000.  Scott Van Dyke, $9,000.  Texas Petroleum

12  Operations, $500.  And then the next page you will see

13  again Scott withdraws $10,250 from this account.

14            None of these transactions are listed.  We

15  have no information about what this money was for, what

16  it was used for, nothing in his accounting.  G-4.  The

17  account has been spent down to 26,287.95.  And by the

18  end of this period, it is down to 2,000.  If you turn to

19  page 4 of 6, you have another check to Texas Petroleum

20  Operations for $1500.  You have a check to Scott Van

21  Dyke for $2,000.

22            Page 5 of 6, Payton Boomer, which is --

23  this is -- I'm assuming it would be the first check paid

24  to them in compliance with their agreement for 27 --

25  2,725.  And then you have Texas Petroleum Operations,

1   $800.  And at that point, you're down to very little

2   money, Your Honor.

3             And interestingly enough, following the

4   decedent's death, Scott continues to access the account

5   and withdraw money.  Even after the power of attorney

6   was distinguished, Scott continues to remove the money.

7   There are deposits coming in, of which we aren't sure.

8   Scott would be the one who could tell us.  Throughout

9   this time period, there's money coming into these

10  accounts from mineral interests, stuff like that.  In

11  his accounting, we have none of that information.  So

12  the accounting is wholly inadequate.

13            And Mr. Krohn practices in this area.  He

14  knows it's inadequate.  He wants to make claims that

15  Scott's unable to pay for it, Scott's unable to access

16  the documents.  Well, Scott has a duty to account.

17            You're also going to see a really long

18  argument that we all heard this past week or two weeks

19  ago at the fiduciary litigation seminar.  And it's an

20  argument that once the decedent dies that -- or once the

21  principal dies, that the right to an accounting dies

22  with it.  What you won't see is any case ever holding

23  that because it's never been held.  It's an argument,

24  it's an academic argument as to whether or not there is

25  a right to that or not.

1                And I would ask this Court to rule in the

2    same way that this Court and every court in Harris

3    County has ruled since I started practicing is, the

4    executor is entitled to demand an accounting from an

5    agent under power of attorney.  And there's not a single

6    written law or case that would say otherwise.

7                So without a doubt, the accounting is

8    inadequate.  Without a doubt, there is information that

9    we need and we're entitled to get in which Scott owes to

10   the estate.  I also indicated in my -- just so that

11   we're clear, I indicate in my motion that I would

12   provide additional information at court because of the

13   size of it.

14               May I approach?

15               THE COURT:  Yes.

16               MR. CULP:  This is just a set of every --

17   every check written on this account starting in December

18   of 2017.  And what -- all I'm asking the Court to note

19   is that every single check, every single withdrawal is

20   signed by Scott Vincent Van Dyke.  He is handling this

21   account at all times.  And for him to indicate now that

22   he's unable to account for his actions is not

23   sufficient.  He has to account.  He is going to tell

24   you, Your Honor, that he's -- that he doesn't have

25   money.

1          May I approach, Your Honor?

2          THE COURT:  Yes.

3          MR. CULP:  So this is an excerpt that was

4  downloaded from Scott's eviction case of which he

5  successfully avoided eviction.  And what it shows --

6  this is Scott's own exhibit in that case.  And what it

7  shows is that since May of 2023, he has purportedly paid

8  $480,000 for his house.  This is the man who claimed

9  bankruptcy, claimed to have no money, claims now to not

10  have sufficient funds to account to this Court and to

11  the estate for the actions that he took.

12          So the idea that he doesn't have funds is

13  not true.  And so I don't know where these funds are

14  coming from.  You can't tell.  They are going into

15  Scott's account.  But in here, there is -- there is one

16  transaction where Scott is sending over $100,000 back to

17  whatever account he's pulling from.  Now, I don't know

18  any information about this, but he's clearly got access

19  to funds available for him to account.

20          THE COURT:  You're saying a third account,

21  separate and apart from --

22          MR. CULP:  All I have is this --

23          THE COURT:  No.  I'm asking -- you just

24  referenced an account he's putting money back into.

25          MR. CULP:  Okay.

```
 1                    THE COURT:  What do you mean?

 2                    MR. CULP:  Correct.  This is his personal

 3      account.  This is his eviction.  This is his defense to

 4      the eviction.  And in here, he provides the statements

 5      which are his account.

 6                    THE COURT:  Right, separate from what

 7      the --

 8                    MR. CULP:  Yes --

 9                    THE COURT:  -- POA?

10                    MR. CULP:  -- completely separate.  I've

11      taken control of those accounts.

12                    THE COURT:  Okay.

13                    MR. CULP:  And then there's a third account

14      from which money is coming in and money is going back to

15      from Scott's account during the time period that he

16      presented --

17                    THE COURT:  And going in and coming out are

18      what you're showing me right here?

19                    MR. CULP:  Yes, Your Honor.  That's his

20      exhibit in the eviction court.  So this shows what he

21      paid or he purports to have paid.  And he won this

22      eviction case, so I'm assuming that he could prove this.

23      $480,000.  And this is his Frost account.

24                    And you will see there is money coming in

25      from 0277.  And then -- yes, 0277 is where money comes
```

1    in.  And then there's -- at one point, there's over

2    $100,000 that actually goes back to the account from

3    which it was coming from or from which all these

4    transfers were coming 30 to $40,000 a month.

5                    Yeah, there's a teller deposit on 4-25

6    where he transferred to that same account, 3724.  That's

7    on page 1 of 4, statement 5-21-24.  So -- and that's

8    after he deposited something for over $100,000.  So he

9    does have access to funds.

10                    THE COURT:  And this one that you handed me

11   shows the 30,000 payment as late as September of 2024 --

12                    MR. CULP:  Correct, Your Honor.

13                    THE COURT:  -- for mortgage.  Is that what

14   that's for?

15                    MR. KROHN:  Your Honor, I would object to

16   the tender of these exhibits.  These are not certified

17   copies.  They've not been offered.  The information is

18   hearsay.

19                    MR. CULP:  Scott's here if you want to ask

20   him if they're real.  We can put him on the stand right

21   now.

22                    THE COURT:  Is that you -- are we doing

23   that?

24                    MR. CULP:  I'm happy to.  If that's the

25   objection, I will put Scott on the stand right now.

1          MR. KROHN:  Your Honor, these exhibits,

2     first of all, have not been produced in discovery prior

3     to two minutes ago.  I have no way to authenticate them.

4     And you're putting my client on the stand --

5          THE COURT:  No, I didn't say I was putting

6     him --

7          MR. KROHN:  Well --

8          THE COURT:  I didn't say that.

9          MR. KROHN:  -- they're saying put my client

10    on the stand to prove up exhibits that have never been

11    produced in discovery.

12         MR. CULP:  We just got them.

13         THE COURT:  Okay.  All right.  So we'll

14    hold on to these.  I can make my decision regardless.

15         MR. KROHN:  Thank you, Your Honor.

16         THE COURT:  Okay.  Is there anything else?

17         MR. CULP:  Your Honor, I guess I am -- I

18    have asked that the Court find that Scott is in contempt

19    for failing to do this.  I did notify and I've attached

20    a letter that I sent to Mr. Krohn asking him to amend

21    the accounting to comply with the law.  I never got a

22    response from that.  Your court -- Mr. Krohn's argued

23    that sanctions are not appropriate here but, he's in

24    contempt of an order.

25              This Court ordered this accounting and he's

1   failed and refused to do so.  We're down here again.

2   I'm happy to put on -- you know, if the Court is going

3   to consider sanctions, I can put on my fees for the

4   amount of fees that I have incurred in getting this

5   accounting to date.  But I don't want -- I don't want to

6   take the Court's time unless that's something that the

7   Court is going to consider.

8                   THE COURT:  Okay.  So how much time,

9   Attorney Krohn, do you think it would take for your

10  client to provide a proper accounting, or if ever?

11                  MR. KROHN:  There's -- Your Honor, I

12  certainly hate to concede the point out of context

13  because there are bigger issues at play here.  And I

14  don't want to present the arguments out of context, but

15  I will answer at this point I don't know.  And I will

16  explain to you why.

17                  THE COURT:  Okay.

18                  MR. KROHN:  The -- I certainly just want to

19  be very clear I'm taking this out of context, but I will

20  explain the problem with the account.  What Mr. Culp has

21  not explained to you is that on November 8th, I

22  believe -- and if you look at the response to the motion

23  that was filed, exhibit -- attached as an exhibit is an

24  email that I sent to Mr. Culp on November 25th with a

25  date of transfer.

```
 1                    THE COURT:  Is it your answer?

 2                    MR. KROHN:  It's in the answer, Your Honor,

 3   Exhibit 2, I believe, or right before Exhibit 2.  It

 4   looks like 1-8.  But I guess it's the last page of

 5   Exhibit 1.  And on November 8th, we provided Mr. Culp

 6   with approximately 3,141 pages of --

 7                    THE COURT:  I do recall that.

 8                    MR. KROHN:  And they were sent to him by

 9   Dropbox.  This was part of our communication that I

10   explained to Mr. Culp we had these records, we can

11   provide them.  There were some issues trying to get the

12   transfer link to him, so we offered to send him a USB.

13   We ended up sending it by a Dropbox transfer.

14                    And these records include adequate

15   explanations of what occurred.  There were accounting

16   ledgers -- I don't want to say they were QuickBooks or

17   whatever, but they were some sort of accounting ledger

18   system that was obtained by Mr. Van Dyke's former

19   accountant.  I don't want to say CPA, but she was an

20   accountant --

21                    THE COURT:  Bookkeeper.

22                    MR. KROHN:  -- at the company and she was

23   doing personal financial transactions.  She maintained

24   his checkbooks for him.  So these were disclosed

25   transactions that were incorporated into the account.
```

1   If you look at the response that was provided --

2                  THE COURT:  What date was that, your

3   response?

4                  MR. KROHN:  The response that was

5   provided -- the account itself was submitted to Mr. --

6   Mr. Culp --

7                  THE COURT:  Culp.

8                  MR. KROHN:  -- on the 26th of September, I

9   believe, or the 27th.  It was the day after the hearing.

10                  THE COURT:  Okay.

11                  MR. KROHN:  And at that time in the account

12  that was produced, we made reference -- the cover letter

13  that was provided, we made reference to the fact that we

14  were providing these -- these documents separately and

15  that they were intended to be incorporated.  So when we

16  produced these records, we believed that the account was

17  complete based off of the complete side of information

18  that we had available to us at that time.

19                  And Mr. Culp is correct in one sense, which

20  is we do argue we don't have some of these records.

21  These were online banking records that were maintained

22  with Mrs. Van Dyke's online accounts.  And when she died

23  and my client's authority as agent lapsed, he doesn't

24  have access to those records anymore.  The only person

25  who has access to her online records is Mr. Culp.  And

1   he hasn't given us those records.  If he says, I want

2   you to go through and identify specific transactions, we

3   don't have the records.

4              And so it's not that we are destroying the

5   records and we didn't keep them.  It is not outside the

6   bounds that any fiduciary, whether you're a trust

7   officer at a bank or a trustee in private practice,

8   you're usually maintaining your records in an on --

9   they're available online, you keep them online.  You

10  don't destroy them.  The underlying transactions and

11  data that Mr. Van Dyke used to reconcile these records

12  was provided.  It was months ago, a month and a half ago

13  at the very least.  And that is my explanation to the

14  Court.

15             But before we get into the substance of

16  whether there was compliance or not, there's a more

17  fundamental question, Your Honor, on two grounds.  And

18  the first one is:  Is there authority to compel an

19  accounting under 104 -- 751.104 after the agent dies.

20  And second, do we get into the concept that there is or

21  isn't compliance with the order.

22             And so addressing the first issue, Mr. Culp

23  is correct that was one of the topics that was presented

24  at the fiduciary litigation conference that occurred on

25  December 5th and 6th.  It was a paper written by Kenneth

1   Sumner and Elisa Silguero from Romano Sumner and it was

2   presented by Ryan Cantrell from Chamberlain Hrdilka.

3              And the argument that's advanced in that

4   paper is when you read the text of the statute, 701 --

5   751.104, which limits the authority to demand an

6   accounting to the principal, there is no language in

7   that statute that expands the category of individuals,

8   successors, assigns, representatives, heirs, or

9   beneficiaries.  Right?

10              So when you read the statute, it says Mary

11  Theresa Connelly Van Dyke can make a demand for an

12  accounting and there is no authority to say "and anyone

13  else."  The statute itself is final.  It's not

14  expandable.  In contrast, there are other sections of

15  the statute that expand that talk about other people who

16  can ask.  If you look at the right to initiate a

17  judicial action under 251, there is a list of people

18  that is much more expansive than the principal.  It

19  includes successors, guardians, not executors.  Right?

20              That's a very interesting reaction when you

21  look at what language the statute uses that the

22  legislature intended for those.  And there's arguments

23  that can be made many ways one way or the other.  But I

24  think the most pressing reasons why you have to read the

25  right to demand an accounting and compel an accounting

1    under 104 and 105 as being limited rights is the duty of

2    compensation and the duty of reimbursement.

3              When an account is demanded, the agent gets

4    to use fiduciary sources to prepare the account and gets

5    to compensate for their time in preparing that account

6    and the time of reimbursement spent on lawyers and

7    accountants in securing those records necessary in order

8    to prepare the requested accounting.  These are

9    fiduciary expenses.  And the statutes under 751, I

10   believe 1 through 1, specifically says these

11   reimbursements shall be reimbursed.

12             And in this case, if you expand the concept

13   to say a former agent must prepare this accounting after

14   their power -- after their power has lapsed and somebody

15   else is in control of the pot of money, the action to

16   defend themselves in responding to this request is no

17   longer shall be reimbursed.  They do not have access to

18   the money in order to pay for this very expensive

19   accounting that's being questioned.

20             And so there is reason that you should

21   interpret the statute as limited and not expansive.  But

22   further, the legislature has dictated to the courts and

23   to the state what remedy exists when you fail to

24   account.  And under 105, it says the principal may --

25   principal, not their successors, assigns, agents,

1  representatives, guardians, anybody else.  The principal

2  may file suit to compel the account to deliver the

3  account or assets or to terminate the durable power of

4  attorney.  They don't authorize fees and costs.  They do

5  not authorize any of the other relief that Mr. Culp is

6  asking for under this express statute.

7           So what we believe that he's doing is he's

8  asking the Court to do that which it cannot, which is

9  judicially amend the statute, add words and theories and

10 claims that the legislature either did not consider or

11 has rejected.

12           And in this case when you read this

13 statute, the remedy requested, demand to account, is

14 limited to the principal.  And the remedy for the

15 failure to account is to file suit and secure the

16 accounts or terminate the power of attorney.  And there

17 would be no need to terminate the power of attorney

18 after the agent relationship terminates by operation of

19 law upon the principal's death.  Right?

20           So there is no question when Mrs. Van Dyke

21 died, Scott's authority to act as her agent terminated.

22 And so when we look at this, we have to come back with

23 the first question of statutory construction:  Can you

24 compel an accounting in this circumstance?  I, too, did

25 a little bit of research outside of this and there's

1  really no case law that talks about this.  There is only

2  one case that I kind of found that dealt with an

3  analogous issue.  And that is -- may I approach, Your

4  Honor?

5                THE COURT:  Yes.

6                MR. KROHN:  It is a case, *Dawson versus*

7  *Lowrey*.

8                THE COURT:  Thank you.

9                MR. KROHN:  Thank you.

10               It is a 2014 opinion from the Texarkana

11 court of appeals.  For the record, it's Case

12 No. 06-13-00107-CV.  And this case dealt with the demand

13 for an accounting post-death by the POD beneficiaries on

14 an account.  They said, hey, agent, formerly accountant,

15 there's a POD designation, we want to come in and we

16 want to make a claim for an accounting because we're the

17 beneficiaries of this -- of this property and this guy

18 is demanding.

19               And the Texarkana court of appeals came

20 back and said in this circumstance, the successor

21 beneficiaries of this account the POD beneficiaries lack

22 standing to demand an accounting because that right

23 belonged to the principal, not to them.  It didn't

24 transfer.

25               There is no case that talks about whether

1    the executor can do it or not.  There's no case that

2    talks about whether a guardian can do it or not.

3    There's no case that talks about whether a successor

4    agent under a power of duty -- attorney can do it or

5    not.

6              But what we do know out of all these claims

7    is this is different than a guardian that is operating

8    during a time when the agent is alive.  This is

9    different from a successor agent who's operating during

10   the time when the agent is alive.  We're talking about

11   post-death.  And the only case that I have found -- I

12   did not spend 30 hours researching this.  I did spend

13   about 45 minutes looking for it.  So it's something.  Is

14   this one case that talks about the right does not

15   transfer to the estate.

16             What does the personal representative do to

17   represent the estate?  And so if the estate does not

18   have the right, because the right belonged to the

19   principal prior to death, I don't think that the -- I

20   don't think that the personal representative does

21   either.

22             Compounding the problem is now they want

23   you to impose contempt without presenting to the Court

24   any authority saying that the request or the order

25   itself being issued originally is law and without any

1  evidence showing or reference to the fact that over

2  3,000 pages of financial records, registers,

3  transactions were produced that supported the account.

4  So I don't think that contempt is proper.

5            There is something else that I heard today

6  that didn't come across very clearly.  And this is why

7  we'd caution the Court that the issue on reimbursement

8  and cost is very important here.  If you want further

9  accounting and you want to know how many hours it's

10 going to take, I will tell you there's two things that

11 cause me concern.

12           Mr. Culp went to great extent to come back

13 and talk about misappropriation of money by Mr. Van Dyke

14 that's unexplained.  I do not believe that the statute

15 authorizing a fiduciary account in any way would

16 circumvent my client's constitutional rights either to

17 assert a Fifth Amendment defense to responding and

18 incriminating himself in criminal conduct.  And if

19 that's the allegation here, he stole money, my client

20 certainly needs a criminal defense counsel.

21           I think I'm an okay lawyer, but I know that

22 I'm not anywhere near competent to provide criminal

23 defense representation to my client.  He would need a

24 criminal defense lawyer to sit down, go over, and help

25 him prepare the accounting.  And we would need an

1   accountant to go through because there are 3,000 pages

2   of records.  There's hundreds if not thousands of more

3   pages of records that Mr. Culp is in possession of that

4   he would have to provide us so that we can explain what

5   these transactions are.

6           So there are two sources of costs.  So we

7   would need criminal defense time.  We would need my time

8   or -- and probably an accountant's time to come in and

9   prepare the requested relief.  These are all authorized

10  as reimbursements and costs under 751.131(1) -- I'm

11  sorry -- 10 -- reimbursement under the estates code.

12  And so in this case, there is something that -- under

13  751.024.  I'm sorry.

14          So in this case, if we are going to come in

15  and compel further accounting, one, I will tell you I

16  don't know that there's authority to do that, but, two,

17  if we do, the costs have to be secured.  What Mr. Culp

18  is trying to do with the defendant who is bankrupt --

19  and it doesn't matter how he's paying his house or what

20  he keeps a very expensive house.  Texas, for whatever

21  reason, decided to do an unfettered homestead exemption.

22  And Mr. Van Dyke at one time earned a lot of money and

23  has a very expensive home that he's had to fight very

24  hard to keep.

25          But if you are going to come back and say

1  we're going to impose the obligation to do this, the

2  estate should bear that expense, because the estate

3  always should afford that defense -- expense.  I'm

4  sorry.  And there's not an exception to that.  The cost

5  and the reimbursements under 751.024, there is no

6  language that says, well, so long as you're acting in

7  good faith.

8            The language -- the terms of the language

9  are clear.  The agent performing these duties is

10  entitled to reimbursement for his costs and expenses and

11  for compensation.  And so if they're asking for this, my

12  client will ask for time.  I will ask for my time.  I

13  will ask for authority to retain a -- and payment to

14  hire a criminal defense lawyer.  I did speak to one.  He

15  said he would charge us a 15,000-dollar retainer.  His

16  name is Brent Mayr.  He's an excellent criminal defense

17  lawyer in this state.

18             Because not only would we have to go

19  through the account, we're also looking at a deposition

20  that Mr. Cullen's [sic] client wants to take in my

21  client's capacity individually and as a fiduciary.  So

22  that means that we're going to have to have -- that's

23  part of the deposition.

24            THE COURT:  So you're saying that you need

25  to hire counsel because they're going to take a

1    deposition of your client?

2              MR. KROHN:  Criminal defense counsel, yes,

3    Your Honor.

4              THE COURT:  Okay.

5              MR. KROHN:  And so these are all costs that

6    we come back and say should be borne by the estate and

7    should be paid by the estate if we're going to make a

8    former agent have to do that.  Otherwise, what we're

9    doing is we're inventing a set of circumstances for

10   somebody who has just come through bankruptcy and who

11   does not have the money that he once did, is now being

12   held subject to contempt finding because he can't afford

13   to spend 20, 30, 40, $50,000 in production costs to

14   respond to requests.

15             And so I come back and I say -- and I don't

16   like to say this, but I will -- I will sum it up with an

17   academic argument.  What happens if we do not secure

18   additional -- an additional account?  So what if we do

19   not order further accounts?

20             So if the Court comes back and says, I

21   agree I lack authority to compel, or, you know, you have

22   what you have and it just seems like there's going to be

23   a lot of expenses going down this path and whether the

24   estate does or doesn't have money shouldn't all go to

25   pay for Scott's expense.  Right?  These are practical

1  concerns because these are real-life controversies

2  before the Court.  So you say, I'm going to try to

3  figure out what if.  What if the executor or the

4  administrator -- I'm sorry -- has within his ability

5  right now to prove a case if such a claim -- claim

6  survived bankruptcy, such a claim survived Mr. Van

7  Dyke's bankruptcy, he has enough to prove the claim.

8  Right?

9               I've come back and said my client will have

10  to assert the Fifth Amendment either in deposition or in

11  this account and come back and say I cannot answer these

12  things for violation of my Fifth Amendment.  And

13  ultimately, we know what the law is on that.  If you

14  invoke the Fifth, you get to take an adverse inference

15  in a civil case -- all right -- if that's what you're

16  going to do.

17               And so is there a need to further account?

18  No.  Does the executor have within his possession all

19  the information he needs in order to move forward and

20  evaluate if a claim exists?  Absolutely.  Is there a

21  more fundamental question, does such a claim exist and

22  will survive bankruptcy?  It is.  It is presently

23  pending before Judge Lopez in the bankruptcy court.

24  That gets into my motion at the very end.

25               But answering Mr. Culp's motion right now,

1  I don't think you have authority to compel an

2  accounting.  The academic paper that has come up

3  recently and the prevailing thought within the probate

4  community is probably don't have that either.  The

5  courts have come back and the only court that has talked

6  about a successor issuing -- a successor post-death

7  asking for an accounting came back and said

8  beneficiaries of the estate, which means the estate --

9  if you look at 750 -- 101.001 of the Estates Code, upon

10  death, beneficiaries under a will or heirs under law,

11  their -- their rights vested in the estate as it existed

12  at the time of the decedent's death.

13             You know, so your rights in that estate

14  exist in that and all duties that apply at that time.

15  And so if you look at what the courts have come back and

16  said, understanding the state of the law, this right

17  does not seem to transfer to successors of the principal

18  when the principal is dead.  And Mr. Culp is her

19  successor.  And there is no case law for saying that.

20             You should deny compelling by finding

21  contempt.  And if we do want to go down this path, then

22  the estate should have to bear the cost of the

23  production.  Because this is what is required under

24  751.024.  And that is an affirmative claim that we've

25  raised in our pleadings on file before the Court, that

1   these costs should be assessed against Scott.

2           As part of our affirmative defense further

3   asserted in this case a request for attorney's fees.

4   It's not in the response -- well, it is in the response.

5   We're asking for it.  But it is actually part of our

6   pleadings because this motion to compel is part of the

7   pleadings that the administrator has filed.  And so this

8   is a matter that will be before the jury.  And, again,

9   we're entitled to this.

10           And so with all that said and done, the

11   effect of denying the motion, Your Honor, does not pose

12   a grave risk to the estate.  The effect of granting the

13   motion does pose a grave risk to the estate because the

14   Court would have to then authorize payment of tens of

15   thousands of dollars in legal fees.  And so we would ask

16   the Court to deny the motion.

17           THE COURT:  Thank you.

18           MR. CULP:  Thank you, Your Honor.

19           First of all, *Dawson v. Lowrey* doesn't say

20   that the executor or administrator is not the principal.

21   It indicates that the beneficiaries -- and I haven't --

22   I've read it before.  I can't recall exactly what it is,

23   but it's not on point.  Before the Court considers that,

24   they need to really read this case to see that it

25   doesn't apply.

1          *Belt versus Oppenheimer*, which is one of
2     the key cases in this idea of an executor stepping in
3     the shoes, indicates that a personal representative
4     steps in the shoes of the decedent.  And it goes on to
5     state that when looking at whether or not the executor
6     or administrator has a right to file suit or take --
7     step in those shoes and take the action they could, it's
8     on a case-by-case basis and whether there's a policy
9     reason not to.
10          And that's where they get into -- they got
11    into the whole fact of whether or not it was appropriate
12    because of privity to sue a former attorney, the estate
13    planning attorney.  There is nothing in the case law --
14    and Mr. Krohn confirms he wasn't able to find any.
15    There's nothing that says that the principal -- that the
16    administrator is not the principal who can make this
17    demand.
18          The reimbursement or the -- I guess his
19    claim that he's entitled to be paid for that, what the
20    statute says is that he gets reimbursement of reasonable
21    expenses incurred on the principal's behalf.  I think
22    there is a great deal of expenses when you're doing an
23    accounting as a power of attorney when you haven't
24    maintained records that are not reasonable.  Does he
25    have a right to claim?  Sure, he can file a claim with

1  the estate.  But that doesn't prevent the estate from

2  demanding that accounting.  When a -- a guardian steps

3  in and demands an accounting --

4          THE COURT:  So -- hold on.  Let me --

5          MR. CULP:  Yes.

6          THE COURT:  Because this is where I would

7  like to go with this.  I would like the accounting to be

8  supplemented, but I'm not sure exactly what it is you

9  want him to supplement.

10          MR. CULP:  I want -- I want to know what --

11  the money coming in and going out was for out of those

12  accounts.

13          THE COURT:  Okay.  Anything else?

14          MR. CULP:  No.

15          THE COURT:  Okay.  At this time, I'm not

16  going to make a determination on the sanctions.  And I'm

17  going to sign the order for the deposition, though.

18          MR. KROHN:  On the deposition, Your Honor,

19  I want to be very clear -- and I certainly don't want to

20  speak for Mr. Cullen.  The problem on the deposition is

21  not that we don't agree.  The problem is we've also

22  asked to take Mrs. Alonso's deposition too.  And they

23  refused.  She didn't acknowledge our request.  So --

24          THE COURT:  Okay.

25          MR. KROHN:  Mr. Cullen sent me an email and

1  said, hey, will your client waive -- or agree to an

2  out-of-time deposition.  And I said he will, but two

3  conditions need to be met.  One, he would like to take

4  Mrs. Alonso's deposition, too.  And number two, we would

5  need to get some sort of agreement to continue the

6  January 16th trial date.  If we have to supplement, if

7  we have to take two depositions, there's not enough time

8  between now and January 16th to get ready.

9            And in lieu of a response, I got a motion

10  for leave, which is a response saying we don't agree.

11  So we don't have a problem with that.  We would just ask

12  that Mrs. Alonso also be ordered to sit for deposition

13  and we would ask that we be given enough time.  You

14  know, there is --

15            THE COURT:  Do you need a new DCO, though,

16  at this point or is it just for the depositions and a

17  new trial date?  Is that what you're asking for, rather?

18            MR. KROHN:  Yes, Your Honor.  I don't think

19  we need a complete new DCO, but we need both.

20            THE COURT:  Okay.

21            MR. SMART:  Your Honor, may I speak

22  briefly?

23            THE COURT:  Yes.  Sorry.  I've kind of --

24            MR. SMART:  No, that's okay.  I wasn't part

25  of the main case.  But Peter Smart on behalf of Payton

1   Boomer.  I'm with Crain Caton.  If we try the case,

2   Darlene will be trying it.

3                    THE COURT:  Okay.

4                    MR. SMART:  But if the Court is going to

5   order, which it is going to, obviously, the deposition

6   of Scott, to me it doesn't make sense to take his

7   deposition until after whatever he produces.

8                    THE COURT:  Absolutely.

9                    MR. SMART:  Okay.  So from that

10  standpoint need --

11                   THE COURT:  Do we need a time frame for the

12  production of --

13                   MR. SMART:  -- we need to push the trial

14  out four months, five months --

15                   THE COURT:  No.  My question is:  Do we

16  need a time frame for the supplement to the accounting

17  so that we can get the depo and maybe have a trial?

18                   MR. KROHN:  So I consider next week dead,

19  right?  I'm not asking anybody to provide me records on

20  Tuesday.  So if we can have the records -- the bank

21  records that we're missing by sometime the first week in

22  January, I would ask for 30 days to prepare the account,

23  and then the deposition after that.

24                   THE COURT:  Okay.  Do I need an order for

25  all of this to make sure it's all clear to everyone or

1 are we just going to agree on the record?

2                MR. KROHN:  I think that we can submit an

3 agreed order --

4                THE COURT:  On dates --

5                MR. KROHN:  -- or not an agreed order,

6 but --

7                THE COURT:  On the supplementation, depos,

8 and then a new trial date.

9                MR. MCDONALD:  Judge, I just have a

10 question for clarity purposes.  Are you ordering the

11 deposition of Scott Van Dyke --

12                THE COURT:  Yes.

13                MR. MCDONALD:  -- just Scott Van Dyke?

14                THE COURT:  I understood you also wanted

15 to --

16                MR. KROHN:  Mary Katherine, yes, Your

17 Honor.

18                THE COURT:  Okay.

19                MR. MCDONALD:  Is that being ordered as

20 well?

21                THE COURT:  Uh-huh.  Do we have dates that

22 we want those done by?  Oh, you guys are going to

23 agree -- okay.  Well, go ahead.

24                MR. KROHN:  After the account I would say.

25 So --

1          THE COURT:  So I guess we need the

2    accounting date.

3          MR. KROHN:  If we have an account by the

4    first week of February, we can have depositions by mid

5    February, I suppose.

6          THE COURT:  Okay.  And you guys are going

7    to agree to that in an order or do you need me to --

8          MR. KROHN:  And just to let you know, Your

9    Honor, my client has another case that's in April.  So

10   on the trial date, when we go to trial, he has a lawsuit

11   that's presently set for mid April.  That judge

12   continued because it conflicted with our original trial

13   setting.  So that judge continued a couple weeks ago and

14   set it as a priority-one case in mid April.  So aside

15   from that, just the new trial setting would be not at

16   that time.

17         THE COURT:  So we want the accounting done

18   by mid February, supplemented rather.  And then we want

19   depos done by end of February, by end of February or mid

20   March.  You said 30 days?  Am I confused?

21         MR. CULP:  I will have him all of -- any

22   records that I have, I'll have them to him today, if

23   that helps.

24         THE COURT:  Okay.

25         MR. CULP:  So if we could have them by --

1   if we're talking 30 days, I think by February 1st the

2   accounting should be ready, assuming -- you know,

3   subject to me actually giving him the documents.  I'm

4   sure we'll be back here if I don't, but I will give

5   him -- I will get him everything I have today.

6                MR. KROHN:  Okay.  And then depositions by

7   the end of February?

8                MR. CULP:  Mid February, right?

9                MR. KROHN:  February is only about 28 days.

10               MR. SMART:  Let's do the end of February,

11  given the number of attorneys and their calendars.

12               And just another thing, Your Honor, this --

13  the trial setting that's being continued, January 13th

14  trial setting, we were the number-one case.  So from my

15  perspective, what's more important when the Court

16  orders -- sets a new date is that we are number one as

17  opposed to what date -- what date it is.

18               THE COURT:  Yeah.  We're already set all

19  the way till, I think, October of 2025.

20               MR. CULP:  Yeah, that's not -- we need to

21  get it on the --

22               MR. SMART:  Well, we need it sooner than

23  that.

24               THE COURT:  Yeah.

25               (Discussion off the record)

1          THE COURT:  Okay.  So are we looking at --

2   I'm sorry.  What month are we looking at for the trial?

3   In May?  Because of the other trial.

4          MR. KROHN:  Well, that kind of gets into a

5   secondary issue, Your Honor, which is Judge Lopez at the

6   bankruptcy court has been promising an order clarifying

7   whether or not Scott has been discharged or the claims

8   survive since October 8th.

9          What I understand -- I didn't speak with

10  Judge Lopez's staff, but having spent -- Matt Probus is

11  the bankruptcy lawyer.  The issue is Judge Lopez is

12  dealing with the Alex Jones' Infowars bankruptcy

13  proceeding.  I would say brouhaha, but there seems to be

14  the more appropriate legal term.

15         THE COURT:  Uh-huh.

16         MR. KROHN:  And so kind of does not -- does

17  not feel our case is as pressing as perhaps that one is.

18  So if we do have a trial setting in May -- we've been

19  waiting since October.  We could have a finding today or

20  we could have a finding in April.  And so I just don't

21  know.  And so I would just -- if we're going to have a

22  trial setting, that's fine.  But I just want the Court

23  to be aware that we may still be waiting for a ruling

24  from the bankruptcy court as to whether Scott is liable

25  or not.  And that's kind of a fundamental issue in the

1    case going forward.

2              MR. CULP:  To respond to that, Your Honor,

3    I agree it's problematic, but all we -- the most recent

4    order I have seen out of the bankruptcy court is go

5    forth with the lawsuit in probate.

6              THE COURT:  Yeah.  I think we need to

7    just --

8              MR. CULP:  That's the last one.  So I

9    get -- I mean, we'd all like to have this ruling, but

10   there's no -- there is other people involved in this

11   case.  You know, if Scott doesn't -- if Scott -- if

12   there is a judgment and Scott is judgment-proof because

13   of this ruling, there's no reason it has to keep us from

14   going.  This has been here a long time and we really

15   need to get it tried.

16             MR. KROHN:  Except, Your Honor, that a

17   bankruptcy discharge is an affirmative defense that

18   would normally be sustained with summary judgment

19   pretrial.  And it is similar to a plea of immunity,

20   which means that -- for purposes of why it's different

21   than Scott just being judgment-proof, we can't collect a

22   judgment against him; upon discharge, under 11 USC 524,

23   there's an automatic post-discharge injunction that

24   applies.  That is subject to confinements of contempt.

25   Right?

1                   So we have -- filing a bankruptcy gives us

2       the 365 stay.  Post-discharge, there is the 524 stay.

3       And it says --

4                   THE COURT:  At this point, we're not under

5       a stay, correct?

6                   MR. KROHN:  Well, not under the 365 stay.

7       Our position in bankruptcy court is the 524 injunction

8       prevents Mr. Culp, Mrs. Alonso, even her lawyers from

9       continuing or commencing an action on a claim that has

10      been discharged.  So there's not -- there's an

11      injunction, right, there is an injunction.  And what

12      Scott had to do in bankruptcy court is he had to file a

13      motion to show cause for contempt under that injunction.

14      That has been what has been pending since September or

15      October.  And I can tell you the exact date.  It's in

16      the motion.

17                  MR. CULP:  It's been a very long time.

18                  MR. KROHN:  And so the issue that

19      Mr. Culp --

20                  THE COURT:  In the end, if we need to move

21      the trial, that's your concern, is that we're just going

22      to have to move it yet again?

23                  MR. KROHN:  Yes, Your Honor.

24                  THE COURT:  I'm fine with that.

25                  MR. KROHN:  Okay.  I just -- I just don't

1  want the Court to walk away with the impression that we

2  all came back and said --

3              THE COURT:  Yeah.  No.  I understand.

4              MR. KROHN: -- no further continuances.

5              THE COURT:  Yes, I do understand it.  I

6  just think we should set a trial date.

7              MR. KROHN:  And we're fine with that, Your

8  Honor.  So mid -- so let me check.  I want to make sure

9  that I --

10             THE COURT:  Do you have any dates?  May?

11             MR. SMART:  May is fine.

12             THE COURT:  May 19th.  So in my signing

13  the --

14             MR. KROHN:  Oh.  I have a trial, Your

15  Honor, in this court, the Estate of Woodward, on May

16  19th.

17             MR. CULP:  Perfect.  If you don't settle,

18  we get bumped.

19             MR. KROHN:  So I will be here all day.

20  Right?  Just to let the Court know, I'm -- you'll see me

21  a lot that month.  We might spend Mother's Day together.

22             THE COURT:  Yeah.  Okay.  So are we staying

23  with the 19th or are we moving to the next date?

24             MR. CULP:  I'm in trial that week.

25             THE COURT:  On the 26th.

```
1                    MR. CULP:  In Court 5.

2                    THE COURT:  What about the week before, May

3      12th?

4                    MR. KROHN:  Well --

5                    MR. MCDONALD:  I'm sorry.  Are you saying

6      you don't have anything before May 12th?

7                    THE COURT:  No.  I'm saying what about May

8      12th?

9                    MR. MCDONALD:  We have a trial in Madison

10     County.

11                   THE COURT:  Okay.

12                   MR. KROHN:  And I'm in pretrial in this

13     court, Your Honor, the Estate of Woodward.

14                   THE COURT:  Well, but we can move that

15     around.  May 5th?

16                   MR. MCDONALD:  That's the same trial in

17     Madison County for us.

18                   THE COURT:  Okay.

19                   MR. KROHN:  I'm fine with May 19th.

20                   THE COURT:  Okay.

21                   MR. KROHN:  Just everybody just

22     misunderstands --

23                   MR. CULP:  I'm in trial, though.

24                   THE COURT:  May 19th?

25                   MR. KROHN:  I thought you said the 26th.
```

1          MR. CULP:  Is the 26th open?

2          MR. KROHN:  The 26th is open.

3          THE COURT:  Oh, the 26th is open.

4          (Discussion off the record)

5          THE COURT:  Court's closed on the 26th,

6    county holiday.

7          MR. KROHN:  How about June 2nd so that

8    we're not doing pretrial on Memorial Day?

9          THE COURT:  June 2nd?

10         MR. SMART:  That's good.

11         MR. MCDONALD:  That's good.

12         THE COURT:  Okay.  So I just need to know

13   exactly what I'm signing at this juncture.  I know you

14   had a motion to continue.  Am I signing that with a new

15   June 2nd date?

16         MR. KROHN:  Yes, Your Honor.

17         THE COURT:  Have you reviewed it?  Have you

18   all reviewed it?

19         MR. CULP:  I haven't looked at it, no, but

20   I'm --

21         THE COURT:  Okay.

22         MR. CULP:  -- sure I don't have an issue

23   with moving it.

24         MR. MCDONALD:  Are you going to include a

25   new date?

```
1                    MR. KROHN:  Just a trial setting.

2                    MR. CULP:  Trial setting and two depos.

3                    THE COURT:  Two depos.  When are the dates

4    required for the depos?

5                    MR. CULP:  Do you want us to circulate an

6    order?  That might be the easiest --

7                    MR. KROHN:  Well, I think the Judge is --

8                    THE COURT:  I think we need an order.

9                    MR. KROHN:  -- putting it on the record.

10                   THE COURT:  I think we need to, yeah, agree

11   on the record.

12                   MR. KROHN:  So we said produce the account

13   by February the 1st.  And --

14                   MR. CULP:  Depose before March 1st.

15                   MR. KROHN:  The depos before March 1st.

16                   MR. CULP:  Post-accounting before March

17   1st.

18                   MR. KROHN:  Yeah.  And then trial date June

19   2nd.

20                   MR. SMART:  Your Honor, if there's not

21   going to be a new DCO, can -- I would like -- I'm not

22   saying I'm going to do it, but I would like the

23   opportunity to file an MSJ sometime before then, if

24   that's okay.

25                   THE COURT:  Are we --
```

1          MR. KROHN:  Yeah.  I think your DCO does

2  provide that summary judgments have to be heard by a

3  certain date, right?

4          MR. SMART:  Well, yeah.

5          MR. KROHN:  The April DCO, I think, had a

6  deadline for summary judgments.

7          THE COURT:  Yeah.  So maybe we do need --

8          MR. SMART:  There's not going to be -- is

9  there going to be a new DCO?

10          THE COURT:  I think we need a new DCO.

11  We'll do that with the trial date of June 2nd.

12          MR. KROHN:  Will the Court just issue it or

13  do you want us to prepare it and present it?

14          THE COURT:  You want to do it now?

15          She can help you with that.  She can help

16  you right now with that.

17          MR. CULP:  So we don't --

18          THE COURT:  But we need to also specify

19  those depo dates and the February 1st accounting date.

20  Somehow she can just put it in there to make sure.

21          MR. CULP:  Okay.  Perfect.

22          THE COURT:  Okay.  Thank you all.  You're

23  excused.  But just shoot over there.  Happy holidays.

24          MR. CULP:  You, too.

25          MR. KROHN:  Merry Christmas, Happy New

1  Year.

2           THE COURT:  Happy New Year.

3           (Proceedings recessed)

1                    **REPORTER'S CERTIFICATE**

2  THE STATE OF TEXAS  )

3  COUNTY OF HARRIS    )

4

5      I, Mary Ann Rodriguez, Official Court Reporter in

6  and for Probate Court No. 2 of Harris County, State of

7  Texas, do hereby certify that the above and foregoing

8  contains a true and correct transcription of all

9  portions of evidence and other proceedings requested in

10 writing by counsel for the parties to be included in

11 this volume of the Reporter's Record, in the

12 above-styled and numbered cause, all of which occurred

13 in open court or in chambers and were reported by me.

14     I further certify that this Reporter's Record of

15 the proceedings truly and correctly reflects the

16 exhibits, if any, admitted by the respective parties.

17     WITNESS MY OFFICIAL HAND this the 9th day of

18 January, 2025.

19

20
   /s/ Mary Ann Rodriguez
21 Mary Ann Rodriguez, Texas CSR 3047
   Expiration Date:  01/31/2026
22 Official Court Reporter
   Probate Court No. 2
23 201 Caroline
   Houston, Texas 77002
24 713.206.9588

25